UNITED STATES of America, Appellee,

v.

Jeffrey Dewayne LEE, Appellant.

UNITED STATES of America, Appellee,

v.

James Edward NETTLE, Appellant.

UNITED STATES of America, Appellee,

v.

Ed PAQUETTE, Appellant.

UNITED STATES of America, Appellee,

v.

ONE PIPER NAVAJO MODEL PA
31, Appellant.

Nos. 83–2294, 83–2295, 83–2298
and 83–2613.

United States Court of Appeals,
Eighth Circuit.

Submitted May 14, 1984.

Filed Sept. 12, 1984.

Rehearing Denied Oct. 23, 1984.

Heaney, Circuit Judge, filed concurring statement.

Raymond C. Conrad, Jr., Federal Public Defender, W.D.M., Gregory K. Johnson, Asst. Federal Public Defender, Thomas J. Carlson, Springfield, Mo., Donald L. Ferguson, Donald L. Ferguson, Miami, Fla., for appellant.

Robert G. Ulrich, U.S. Atty., Michael A. Jones, Asst. U.S. Atty., Springfield, Mo., for appellee.

Before HEANEY, BRIGHT and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

A plane load of marijuana from Belize destined for an airport near the Lake of the Ozarks gives rise to this series of appeals.

The plane was piloted by James E. Nettle. Because a transponder or beeper had been installed on the plane before it left Texas on the way to Belize, the plane was picked up by radar when it approached New Orleans on its return with the marijuana and was followed by first one and then another U.S. Customs Service chase plane. Ed Paquette was one of the ground crew at the airport awaiting the plane. Jeffrey Dewayne Lee had been at the airport making arrangements for receipt of the shipment but was in Indianapolis at the time of the flight. Nettle, Paquette and Lee were convicted in the district court[1] of four counts of violating 21 U.S.C. §§ 963, 952(a), 846 and 841(a)(1) (1982) and 18 U.S.C. § 2 (1982). The Piper Navajo plane owned and piloted by Nettle was ordered forfeited. The primary issues raised on appeal involve the propriety under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), of the issuance of the search warrant given the claim of false statements intentionally or recklessly made; the denial of motions for acquittal and severance; and the closing argument by the Assistant United States Attorney. We affirm the convictions of Nettle and Lee and affirm the forfeiture of the aircraft but reverse the conviction of Paquette as to all counts because of the prejudicial argument.

Patrick David Wright, a prime mover in the events giving rise to the prosecution, testified on behalf of the government. He entered a guilty plea to two counts of conspiracy as part of an agreement that other charges would not be filed against him. Wright was in contact with an individual in Miami who wanted Wright to fly drugs from the Bahamas. He made arrangements for Nettle to fly from California to meet him in Miami, and, at that time, informed him of his connection with Gene Sellers, owner of the Mistwood Airport near the Lake of the Ozarks in Missouri. In the conversation Nettle mentioned a pilot and mechanic, Jeffrey Lee from Indi-

1. The Honorable Russell G. Clark, Chief Judge, United States District Court for the Western District of Missouri.

anapolis with whom he had been working on a deal in Mexico. The following Saturday Nettle introduced Wright to Lee and Ed Paquette, both of whom told the others of drug sources in Belize. Nettle also mentioned a possible source in Oaxaca, Mexico. It was arranged that Lee would look at the airstrip in Missouri. Wright and Lee later met in Indianapolis and traveled to Missouri to look at the airport, talk with Sellers and discuss certain improvements to be made, such as more lights for the airport.

They returned to Indianapolis, where Wright obtained a sample of the Belize marijuana from Lee and traveled to California to show it to Nettle before Nettle flew to Mexico. Wright then flew back to Indianapolis to meet with Lee, obtained a car and traveled to Missouri to begin work on the airport. Nettle and Lee flew into Lee Fine Airport near the Lake of the Ozarks, and Lee took the plane to Indianapolis for repair work. Nettle and Wright met with Sellers on February 12, 1983, and Nettle offered Sellers $50,000 for the use of the airport, house, and a nearby farm for storing the marijuana. Wright had taken $5,000 expense money from Lee before going to the Lake of the Ozarks; after Nettle left, Nettle mailed Wright an additional $2,000 in expense money. With the expense money, Wright purchased two pick-ups and a Jeep Wagoneer to transport the marijuana from the plane to the farm. Another $1,500 in expense money was turned over to Wright, and four portable radios were purchased.

Lee originally had planned to make the flight to Belize with Nettle. Because Lee's son had been convicted of a crime, Lee decided not to remain as a pilot on the flight because of the possible damage to his son's chances at sentencing. Wright then became Nettle's copilot, while Lee continued to be the connection with Belize. A ground crew for the Mistwood Airport was organized which included Ed Paquette and Wright's brother-in-law, Len Clark. Tim Johnson, Jeff Levine, Mark Owen and Mark McLaughlin were also present at the Mistwood Airport.

On March 4, 1983, Lee and Paquette arrived at the Fine Airport in Nettle's plane with extra fuel tanks on board. Lee gave Nettle and Wright aeronautical charts on which Lee had marked the landing strip in Belize. The seats were taken out of the plane, and black plastic was taped to the floor and sides. On March 6, the plane was fueled, and Wright and Nettle flew to Beaumont, Texas. Lee then called them by telephone and postponed the trip because four other planes were scheduled ahead of them in Belize. On March 9, Wright and Nettle again flew to Texas, this time to Bay City, where they landed and checked into the Holiday Inn. While on the ground the plane, Nettle, and Wright were under surveillance, and the transponder or beeper was installed.

Saturday morning, March 12, at about 1:30 a.m. Nettle and Wright left their motel, went to the Bay City Airport and took off. They flew past Galveston, turned off their exterior lights, and were seen by a following plane flying out into the Gulf of Mexico toward Merida, Mexico, which, as the maps demonstrated, was on the route to Belize.

Wright testified that at the Belize Airport the plane was met by waiting trucks, an American, and several local residents armed with automatic weapons. The American asked if Freddie, who had been mentioned by Lee and Nettle as the contact with Belize, had sent money and said that their plane was the fifth to land that week. There was not room in the plane for all thirty-four bags of marijuana, so seven were left behind. The plane took off and flew across the Gulf, entered the United States near New Orleans, and flew northward through Mississippi, Arkansas and into Missouri, headed for the Mistwood Airport. It was picked up by radar because of the beeper and followed by a Customs' chase plane from Houston and a Customs' plane departing from Jefferson City, Missouri. Near Lebanon, Missouri, Nettle and Wright spotted a following plane. At that time, Nettle made radio contact with the ground crew, who told him that a state

trooper had been spotted earlier observing the airport with binoculars. Nettle decided to abort the landing at Mistwood and warned the ground crew to leave the area. He instructed Wright to open the door and throw the bags out while he flew at a low level. The plane landed in Springfield, Missouri, at the small downtown airport. Nettle and Lee were arrested in a residential area about three blocks away.

There was evidence of numerous telephone calls made between Lee in Indianapolis, motels in Beaumont and Bay City, Texas, and the house at the Mistwood Airport. Twenty-six of the twenty-seven bags of marijuana were recovered. The recovery locations were charted and shown to be within the computer-recorded flight path of the plane. A DEA agent stationed in Central America examined the twenty-six recovered bags, some of which bore the printed word "Belize," and determined from the materials and packaging that all twenty-six bags came from Belize. Customs Agent Richardson, who had been present when the beeper was placed in the plane in Bay City, Texas, and was a passenger in the second chase plane, testified that in Bay City the plane was free of marijuana smell, but that when it landed in Springfield it smelled of marijuana. A police chemist testified that he had recovered marijuana debris from the plane.

After receiving the radio message from Nettle, the ground crew left the airport. Tim Johnson drove away without being stopped, but Mark Owen and Jeff Levine were stopped and questioned briefly by police. Len Clark hid in the woods until after dark, eventually hitchhiked to Springfield, and flew to his home in Oregon. Levine, Owen, Johnson and Paquette all went to a nearby hotel and checked out.

Len Clark testified at the trial in return for an agreement that charges would not be brought against him. In return for a plea bargain involving a guilty plea and an agreement not to have other charges filed against them, Levine and Owen also testified at the trial.

Sellers, the owner of the Mistwood Airport, was tried jointly with Nettle, Paquette and Lee, but was acquitted. At the conclusion of the trial Nettle, Paquette and Lee were convicted on all four counts, including wilfully and knowingly agreeing together to import marijuana in violation of 21 U.S.C. § 963, importing six hundred pounds of marijuana in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2, wilfully and knowingly agreeing together to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846, and possessing with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Nettle and Lee were sentenced to five years on Counts I and III to be served consecutively, five years on Counts II and IV to be served consecutively to each other, but concurrently with Counts I and III, with a special two-year parole term imposed on Counts II and IV. Nettle's sentence also included a $5,000 fine on each count. Paquette was sentenced to six months on Counts I and III to be served concurrently, and imposition of sentence was suspended on Counts II and IV with a period of three years of probation to commence upon his unconditional release from the sentence imposed on Counts I and III.

Insofar as other facts are material to determination of the issues raised on appeal, they later will be recited.

On appeal Nettle argues that the affidavit authorizing installation of the transponder or beeper was obtained by a search warrant containing statements made with reckless disregard for the truth, that statements given to a Magistrate in the bail hearing as to his address and phone number were improperly admitted into evidence in violation of the fifth amendment, and that the Assistant United States Attorney made a prejudicial argument to the jury. Lee also urges error in the closing argument, that his motion to sever should have been granted, that a pretrial hearing should have been held to determine the admissibility of the coconspirators' hearsay statements, that his rights to cross-examination were foreclosed and that he should have been acquitted on all four counts.

Paquette urges error in the closing argument and the denial of his motion to sever and argues that he should have been acquitted of conspiracy under Counts I and II.

### I.

■ Nettle, relying on *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), argues that the district court erred in denying his motion to suppress because of the alleged intentional or reckless false statements in the affidavit. In *Franks,* the Supreme Court held that if it is shown by a preponderance of the evidence that a warrant affidavit includes a false statement made knowingly or intentionally or with reckless disregard for the truth, and if with the affidavit's false material excluded, the affidavit is insufficient to establish probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 155–56, 98 S.Ct. at 2676–77; *see United States v. Wallraff,* 705 F.2d 980, 993 n. 5 (8th Cir.1983) (quoting *United States v. House,* 604 F.2d 1135, 1139 (8th Cir.1979), *cert. denied,* 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980)). According to Nettle, when the recklessly made false statements are eliminated from the affidavit authorizing the installation of the beeper in the plane, there is insufficient evidence remaining to establish probable cause and, therefore, the search warrant must be voided, and his conviction and the forfeiture of his plane reversed.

The district court found that Nettle did not meet his burden of establishing by a preponderance of the evidence that the affidavit contained material misrepresentations made with reckless disregard for the truth. *Franks,* 438 U.S. at 156, 98 S.Ct. at 2677. After a careful review of the evidence presented at both the suppression hearing and at trial, we cannot conclude that the district court's finding was clearly erroneous. *See Marvin v. United States,* 732 F.2d 669, 672 (8th Cir.1984); *United States v. Wuagneux,* 683 F.2d 1343, 1355 (11th Cir.1982), *cert. denied,* — U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983).

The affidavit was filed by United States Customs Air Officer Bobby G. Richardson. The affidavit recited that Sergeant Chamblee of the County Sheriff's Office had reported the arrival of the Piper aircraft at Bay City Airport. The occupants acted in a suspicious fashion in that they would not allow line personnel to view the interior of the aircraft while fueling it and did not open the upper door to exit the aircraft, which was an unusual and suspicious method of deplaning. They purchased a hundred gallons of aviation fuel, paying with cash. Examination of the aircraft revealed that the seats had been removed, that the interior was lined with plastic material, and that the interior of the plane had two large metal fuel tanks with clear plastic hoses. The rear aircraft windows were covered with an opaque substance. The affidavit continued that a check revealed that there was no permit for the illegal fuel tank installation. It expressed the conclusion that the aircraft was outfitted for smuggling in violation of United States laws and regulations, since the addition of fuel tanks without FAA approval is a common technique used by smugglers to increase the range of the aircraft. The affidavit also stated that the aircraft was registered to Pacific Aviation, Inc. of 3430 East Tropicanna Avenue, Las Vegas, Nevada, that telephone information contained no listing for that corporation, and that the address was shown to be that of a large shopping mall with no such company listed.

The district court conducted a hearing on the motion to suppress as required by *Franks, supra,* and determined that even if the statement regarding the installation of plastic tubing was completely incorrect, and was therefore excised from the affidavit, there was sufficient information remaining in the affidavit to establish probable cause. The court found that the installation of the interior fuel tanks, the removal of the passenger seats, the darkening of the windows and the plastic liner, as well as the method of alighting from the plane,

was ample evidence to arouse the suspicion of the officers and to support the issuance of the warrant.

Nettle contends that several of the statements in the affidavit were made with reckless disregard for the truth. We will examine each of his allegations in turn. First, Nettle complains that the statement that "Sergeant Chamblee advised that two individuals flying the aircraft had acted in a 'suspicious manner' in as far as they would not allow 'line personnel' to view the interior of the aircraft while fueling it," was both materially false and made with reckless disregard for the truth. To support his argument, Nettle relies on the testimony of Tony Stanley, the line person fueling the plane, who testified that he did not attempt to look inside the aircraft.

The testimony at the hearing established that Sergeant Chamblee and Deputy Rooth of the Sheriff's Department had been briefed on conditions to look for in planes that might be involved in smuggling operations. Rooth stated that his attention was called to the plane because it had modifications, including four blade Q-tip propellers for high lift and high performance as well as a long-range antenna, two facts which the affidavit did not include. The plane was the only one landing at the airport with the passenger compartment darkened. He saw the pilots open the lower part of the door and exit through it in an unusual fashion, leaving the upper part of the door closed. He testified that the darkened windows and the unusual manner of exiting the plane appeared to be methods to keep others from looking into the plane. We conclude that while this testimony may be in conflict with that of the individual fueling the plane, it supports the statement in the affidavit that the conduct of the individuals aroused suspicion in that they did not allow line personnel to view the interior of the aircraft while fueling it.

Next, Nettle argues that the statement that the aircraft windows were covered with an "opaque substance" was made with reckless disregard for the truth be- cause an opaque substance is impenetrable by light and is neither transparent nor translucent. This argument is simply a play on words and is too insubstantial to come close to establishing the charge that the windows were darkened even though it was possible to see through them with a flashlight.

Nettle also contends that the statement of affiant that FAA Inspector Andrews said there was no FAA permit for the internal fuel installation was false in that Andrews testified that what he told Richardson was that no permit had been issued from *his district office* of the FAA. Regardless of what Andrews' actual statement was, Nettle failed to establish that the statement was false, i.e., that such a permit did exist, and the record demonstrates that the installation of fuel tanks in the interior of the plane without a permit violated regulations. Nettle also claims that Andrews' statement that a fuel tank installation using plastic tubing was illegal was false and made in reckless disregard of the truth. Assuming that Andrews' statement regarding the plastic tubing was erroneous,[2] Nettle did not show that the affiant Richardson did not believe Andrews, or that Richardson acted recklessly. Without such a showing, Nettle has failed to satisfy his burden.

> [T]he Fourth Amendment demands a [truthful], factual showing sufficient to comprise "probable cause". * * * This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. * * [I]t is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Franks*, 438 U.S. at 165, 98 S.Ct. at 2681 (quoting United States v. Halsey, 257

---

**2.** Nettle produced evidence that plastic tubing is an acceptable tubing for aircraft installation.

F.Supp. 1002, 1005 (S.D.N.Y.1966)). *See United States v. Luschen,* 614 F.2d 1164, 1172 (8th Cir.), *cert. denied,* 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980); *cf. Rugendorf v. United States,* 376 U.S. 528, 533, 84 S.Ct. 825, 828, 11 L.Ed.2d 887 (1964) ("Since the erroneous statements * * * were not those of the affiant, they fail to show that the affiant was in bad faith or that he made any misrepresentations * * * in securing the search warrant."). The fact that Richardson checked with Andrews regarding any FAA violations defeats any charge of recklessness. Nor did Nettle prove that Andrews' alleged misstatement was made deliberately or with reckless disregard for the truth. *See United States v. Bulgatz,* 693 F.2d 728, 732 (8th Cir.1982), *cert. denied,* 459 U.S. 1210, 103 S.Ct. 1203, 75 L.Ed.2d 444 (1983). The district court found that Andrews' opinion, even if incorrect, was not "expressed in bad faith." Mere negligence or innocent mistake is insufficient to meet the requirements of *Franks.* 438 U.S. at 171, 98 S.Ct. at 2684.

Finally, Nettle claims that Richardson recklessly failed to include Nettle's entire corporate address in the affidavit. According to the evidence, the complete address for the registered aircraft is Suit 44, 3430 East Tropicanna, Las Vegas, Nevada. This address was the home of ATC Corporation, a company which handles telephone calls and mail forwarding for various corporations in the state of Nevada. Nettle stated that he paid ATC a yearly sum for the forwarding of his mail to his residence address. He argues that the omission of the wording "Suite 44" constitutes a material misrepresentation bearing on the existence of probable cause. We agree that the testimony concerning the address of the aircraft may not be such as to arouse suspicion when the full explanation is given. However, we conclude that this portion of the affidavit is not necessary to the finding of probable cause.[3]

**3.** Nettle also argues that the payment of cash for the fuel was not a suspicious act. Since we also conclude that this statement is not necessary to a determination of probable cause, it need not further detain us.

Even where the defendant's allegation of perjury or reckless disregard for the truth is established by a preponderance of the evidence, the search warrant is invalid and the fruits of the search excluded only if, with the affidavits' false material set to one side, the affidavits' remaining material is insufficient to establish probable cause. *United States v. House,* 604 F.2d 1135 (8th Cir.1979), *cert. denied,* 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980). Under the totality of the circumstances standard of *Illinois v. Gates,*[4]

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, * * * there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis ... for concluding" that probable cause existed.

462 U.S. 213, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Unlike the affidavit in *United States v. Little,* 735 F.2d 1049, 1054–55 (8th Cir.1984), the information in the affidavit in this case provided a substantial basis from which it could be concluded that contraband or evidence of a crime would be discovered on the plane. After deleting the portions of the affidavit concerning the plastic tubing, the address of the aircraft, and the cash payment, the affidavit would still include the following: the plane arrived with darkened windows; the individuals exited the plane in a suspicious manner, leaving the top part of the door closed; the seats were removed from the passenger compartment; auxilliary fuel tanks were installed; and the cabin was lined with plastic. We conclude that the district court did not err in finding that this

**4.** In *United States v. Little,* 735 F.2d 1049, 1054 (8th Cir.1984), we held that the *Gates* standard was to be applied to all searches whether they took place before or after the *Gates* decision.

information was sufficient to authorize issuance of the warrant. Therefore, we affirm the district court's denial of Nettle's motion to suppress.

## II.

Paquette and Lee each argue they should have been severed from the other defendants for separate trial. Paquette argues that his right to a fair trial was prejudiced in that he was unfairly linked to Nettle and Lee who, unlike himself, were monied major drug smugglers. Lee similarly argues that the evidence was far stronger against the others, and that testimony of a trip by Nettle and Owen to the Cayman Islands and of a marijuana transaction involving Nettle, Wright and "the Colonel" in Oaxaca, Mexico established in the jury's mind the idea that all defendants were widely traveled, major drug traffickers.

■ The general rule is that persons charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts. *United States v. Krevsky*, 741 F.2d 1090, 1094 (8th Cir.1984); *United States v. Miller*, 725 F.2d 462, 467 (8th Cir.1984); *United States v. Boyd*, 610 F.2d 521, 525 (8th Cir.), *cert. denied*, 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980); *United States v. Jackson*, 549 F.2d 517, 523 (8th Cir.), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977). A defendant must show more than that his chances for acquittal would have been better had he been tried separately. *United States v. Singer*, 732 F.2d 631 (8th Cir.1984); *United States v. Love*, 692 F.2d 1147, 1152 (8th Cir.1980). Rather, the prejudice must be "clear" and "real." *Miller*, 725 F.2d at 467; *United States v. Bostic*, 713 F.2d 401, 403 (8th Cir.1983); *United States v. Boone*, 641 F.2d 609, 613 (8th Cir.), *cert. denied*, 454 U.S. 831, 102 S.Ct. 129, 70 L.Ed.2d 109 (1981). A denial of severance is not grounds for reversal unless such prejudice and an abuse of discretion are shown. *United States v. Burchinal*, 657 F.2d 985,

995 (8th Cir.), *cert. denied*, 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981).

■ The testimony demonstrates that Paquette and Lee were involved in the formation of the operation. There was evidence that Nettle's trip to the Cayman Islands was made to obtain expense money to finance a smuggling operation. There was further testimony that after the Cayman Islands trip, Nettle, Wright, Lee and Paquette met to discuss drug smuggling and Paquette and Lee told Wright and Nettle of possible drug sources in Belize. There was additional testimony that later Wright delivered to Nettle Lee's sample of Belize marijuana to be compared with Oaxaca marijuana. Thereafter, the decision was made to go to Belize. Given such evidence of involvement by Paquette and Lee in the planning of the operation and the foreign adventures connected with it, we find that they were not so prejudiced that there was an abuse of discretion in the trial court's denial of their respective motions to sever.

## III.

### A.

Lee argues that the district court violated his sixth amendment right to cross-examination in refusing to permit his counsel to question Mark Owen about his plea bargain agreement and to question Wright about prior inconsistent statements to DEA agents concerning the Cayman Islands trip.

On direct examination, Owen testified that he had pleaded guilty to one count of the indictment, conspiracy to possess marijuana with the intent to distribute it, and that three other counts had been dismissed. On cross-examination, Lee's counsel established that Owen was not to be charged with any other violations of the law including, in addition to smuggling marijuana, an attempt to smuggle money into the country, which Owen admitted that he had done for the purpose of financing the operation. At that point Nettle's counsel objected to further testimony along this line. There was no motion to strike the testimony al-

ready in and no offer of proof as to further testimony that would be given by Owen on this subject.

Patrick Wright testified on direct examination that Nettle and Owen had made a one-day trip to the Cayman Islands and that he had met Nettle on at least one occasion after his return. Lee's counsel on cross-examination asked how long Nettle was gone on this trip. An objection made by Nettle's counsel was sustained. In discussions out of hearing of the jury, Lee's counsel, while not making a formal offer of proof, stated that Nettle had testified before the grand jury that the trip lasted four days, and, further, that Wright had testified that after the Cayman trip he never met with Nettle in Miami. Lee's counsel stated he sought by this line of questioning to show inconsistencies in Wright's testimony. The district court made plain that it was concerned with the prejudicial aspect of the trip or trips to the Cayman Islands.

█ The district court has broad discretion in limiting the scope of cross-examination, Fed.R.Evid. 611(b); *Villanueva v. Leininger*, 707 F.2d 1007, 1010 (8th Cir. 1983); *United States v. LaVallie*, 666 F.2d 1217, 1220 (8th Cir.1981), and will not be reversed unless there has been a clear abuse of discretion and a showing of prejudice to defendant. *United States v. Cole*, 449 F.2d 194, 199 (8th Cir.1971), *cert. denied*, 405 U.S. 975, 92 S.Ct. 1200, 31 L.Ed.2d 250 (1972). With respect to the cross-examination of Owens' guilty plea, we believe that the issue was fully brought before the jury. The jury was aware that he would not be further prosecuted for other charges, including smuggling money into the country without going through customs. We cannot conclude that the district court erred in further limiting cross-examination on this question.

█ With respect to the cross-examination of Wright, Lee argues that the limitations in regard to the Cayman trip deprived him of the opportunity to show a prior inconsistent statement and also raised a question about whether there had been a first meeting with Lee. He argues that he

was deprived of an opportunity to impeach the testimony of the prosecution's chief witness against him.

However, Wright's testimony to the length of the trip was based upon a reading at trial of Nettle's diary which contained notations showing that he left January 19 and returned January 20. The same dates for the Cayman Islands entry and immigration were read into the record by the District Attorney from Nettle's passport after Wright had identified the passport. Therefore, we do not believe that direct impeachment of Wright's testimony is involved. Further, recent publicity had pointed to the Cayman Islands as a source of banking support for the drug trade. The district court properly weighed the potential prejudice to Nettle resulting from further examination on the topic in sustaining the objection. Wright, the chief pillar for the prosecution, was vigorously cross-examined by counsel for all four defendants and his credibility was thoroughly tested. We see no abuse of discretion in limiting the cross-examination in these two respects.

**B.**

█ Nettle argues that the district court erred in admitting, from the bail bond application, Nettle's address and telephone number. The district court had earlier sustained an objection to this evidence, but later reversed the ruling and admitted the evidence. Nettle, citing *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and *McGautha v. California*, 402 U.S. 183, 212, 91 S.Ct. 1454, 1469, 28 L.Ed.2d 711 (1971), argues that he had a right under the eighth amendment to obtain bail, and that the exercise of that right should not have required him to surrender his fifth amendment rights.

It is not necessary that we reach this issue, which, as Nettle correctly points out, would be one of first impression in this circuit. The evidence was limited to Nettle's address and telephone number. Exhibits containing Nettle's address also introduced into evidence included his pass-

port, motel registration cards, a motel bill, a certified copy of FAA records for his aircraft, and telephone company toll records. Exhibits containing Nettle's telephone number also introduced into evidence included a business card for Nettle's corporation seized from Lee at the time of his arrest and the telephone company toll records.

Therefore, the evidence was before the jury from independent sources. We have held that cumulative evidence is harmless error. *United States v. Leichtling*, 684 F.2d 553, 557 (8th Cir.1982), *cert. denied*, 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983); *United States v. Callison*, 577 F.2d 53, 55 (8th Cir.), *cert. denied*, 439 U.S. 873, 99 S.Ct. 209, 58 L.Ed.2d 187 (1978); *United States v. Jacobson*, 536 F.2d 793, 795 (8th Cir.), *cert. denied*, 429 U.S. 864, 97 S.Ct. 171, 50 L.Ed.2d 144 (1976); *United States v. Anderson*, 447 F.2d 833, 839 (8th Cir.1971), *cert. denied*, 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972). Thus, even if we assume that the bail bond application was improperly admitted, any error in such admission was harmless.

Lee argues that the court should have afforded a pretrial hearing to establish the conspiracy and establish the admissibility of statements of coconspirators. He relies primarily on *United States v. Howard*, 706 F.2d 267, 270 (8th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 341, 78 L.Ed.2d 309 (1983), and particularly on Judge McMillian's statements that he believed this circuit should no longer follow the order of proof established in *United States v. Bell*, 573 F.2d 1040 (8th Cir.1978). In *Llach v. United States*, 739 F.2d 1322, 1328 (8th Cir.1984), we made clear that we have not departed from the procedure set forth in *Bell*. We find no error in the trial court's decision not to conduct a pretrial hearing in the instant case.

## IV.

Lee argues that his motion for acquittal should have been sustained as to all four counts; Paquette argues that his motion

for acquittal as to Counts I and III, the conspiracy counts, should have been sustained. In reviewing such motions, the verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1941); *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *United States v. Wade*, 740 F.2d 625 at 628–629 (8th Cir.1984); *United States v. Hudson*, 717 F.2d 1211, 1213 (8th Cir.1983); *United States v. Henneberry*, 719 F.2d 941, 945 (8th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1612, 80 L.Ed.2d 141 (1984).

The essence of a drug conspiracy is agreement by two or more persons to violate narcotics law. *United States v. Alberti*, 727 F.2d 1055, 1059 (11th Cir. 1984); *United States v. Lee*, 694 F.2d 649, 652 (11th Cir.), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983); *United States v. Tamargo*, 672 F.2d 887, 889 (11th Cir.), *cert. denied*, 459 U.S. 864, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982). The existence of the agreement may be proved by circumstantial evidence. Proof is not required that a defendant have knowledge of all the details of the conspiracy; rather, only knowledge of its essential object is required. A defendant may be found guilty even if he only plays a minor role in the total scheme. *Alberti*, 727 F.2d at 1060; *Lee*, 694 F.2d at 652; *Tamargo*, 672 F.2d at 889; *United States v. Robertson*, 659 F.2d 652, 656 (5th Cir.1981). Once the existence of a conspiracy is established, even slight evidence connecting a defendant to a conspiracy may be sufficient proof of involvement in the scheme. It is only necessary to show that he knowingly contributed. *United States v. Bruneau*, 594 F.2d 1190, 1198 (8th Cir.), *cert. denied*, 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979). The testimony of a coconspirator is sufficient to establish both substantive and conspiracy narcotic offenses. *United States v. Abrahamson*, 568 F.2d 604, 607 (8th Cir.1978).

Lee argues there was insufficient evidence to prove an agreement was actually made between him and the other parties to enter into a conspiracy. He contends that he was hired to make repairs on Nettle's plane, which is his occupation, but that he had nothing to do with the stripping and refitting of the airplane for long-distance flights. While admitting there is evidence he had agreed to copilot Nettle's plane, he argues that he withdrew from his position as copilot and, indeed, from the entire operation prior to the flight to Belize. He further argues that although at the time of the flight to Belize he rented the motel rooms in Indianapolis at Wright's request, he never occupied the rooms or made calls from them. He argues that the allegation that he would provide a contact for loading the plane with marijuana in Belize was never sufficiently proved, and that he never traveled to Belize or made contact with anyone in Belize.

Patrick Wright's testimony and the evidence corroborating it are critical to a determination of the actions Lee took. Wright testified that Nettle told him in January, 1983, that he was working on another deal in Oaxaca, Mexico, with "Jeff from Indianapolis" and discussed calling Jeff about use of the Missouri airstrip. On January 22, 1983, Wright met with Lee, Nettle and Paquette at a Miami restaurant where both Lee and Paquette stated that they had a drug connection in Belize. During the conversation, Lee, Nettle and Wright discussed the connection in Belize and the nature of payment for the marijuana and plans for Lee and Wright to go to Missouri to inspect a proposed airport. Telephone toll records showed that later Nettle made calls from Oaxaca, Mexico to Lee in Indiana, and that Lee called Nettle in California three times and Paquette twice in Miami.

Wright testified that he made the trip to Missouri with Lee to inspect the airport and that, after returning to Indiana, following a meeting with Nettle, Lee gave him $5,000 and a notebook and rented him a car. Airplane tickets, car rental records, motel records and the notebook taken from Lee at his arrest, which was similar to that he gave Wright, all corroborated Wright's statements. Wright further testified that Lee flew Nettle's plane into Missouri and gave him an additional $1,500 expense money. Nettle's diary reflected both of these expense items. Wright's testimony as to why Lee decided not to remain as a pilot was corroborated by Indiana state court records. The aviation map recovered from Nettle upon his arrest also corroborated Wright's testimony that Lee gave a map to him and Nettle on which the location of the Belize airstrip was marked. Telephone records for the motels in Indianapolis corroborated Wright's testimony that Lee had called Nettle twice in Texas. When Lee was arrested, he had business cards of Nettle and Paquette.

The credibility of the evidence is for the jury to determine. While Lee offered his ex-wife's testimony that he was at home on March 6 and could not have made the calls, and testified himself that he flew to Miami in January, 1983, to renew friendships, and to Missouri to sell solar energy equipment to Sellers, this testimony was subject to evaluation by the jury. We have no difficulty in concluding that the evidence was sufficient to justify the district court's denial of the motions for acquittal as to all four counts.

Paquette argues that there was insufficient evidence to establish that he was a member of the conspiracy. He contends Wright testified only that Paquette had stated at the January 22 meeting that he had a connection in Belize but not to any further involvement by Paquette in the conspiracy. He also argues that while there was evidence that he was to be a lookout, there was no evidence he acted as such in furtherance of the conspiracy.

However, in addition to Wright's testimony that Paquette stated he had a drug connection in Belize, Wright also testified that Paquette was with Lee when Lee flew to the Fine Airport at the Lake of the Ozarks in Nettle's plane. Wright testified that he, Nettle, Lee and Paquette drove to

**1252**

a restaurant and talked, during which meeting Lee gave the aviation map of Belize to Nettle and Wright. Later Paquette, Nettle and Wright drove to Sellers' lake house and stored the fuel tanks of the airplane in the garage. Clark and Levine testified that Paquette also was present at Sellers' lake house during the telephone call from Nettle on March 6 advising of the postponement, and during the call from Nettle on March 12 advising of the approval to fly and the expected return time. Clark, Levine, Owen and Wright all testified that Paquette was to act as a lookout. Clark testified that he had communications with Paquette over the radio while waiting for the plane, and Levine testified that he used the portable radio to warn Clark and Paquette to clear out after the landing had been aborted. After the landing was aborted, Levine and Owen testified that they met Johnson and Paquette at the motel. Paquette stated he would dispose of the pickup truck which had the plane seats and carpet, pumps and battery in the back. All agreed they would leave the area. When Clark arrived at home in Oregon, Paquette phoned him and told him that everything had gone wrong and that Wright and Nettle had been arrested. Paquette's phone records verified the call.

Considered in a light most favorable to the prosecution, we think it evident that this testimony was sufficient for a jury to find that Paquette was connected with and a member of the conspiracy.

### V.

Nettle, Lee and Paquette all argue that the closing argument of the Assistant United States Attorney prejudiced the jury and deprived them of a fair trial. The argument that is the subject of their complaint came in the closing portion of his argument; the essential question before us is whether the argument had been provoked by counsel for the defendants in their argument. The District Attorney argued as follows:

[S]muggling in 640 pounds of marijuana is definitely wrong. It is a crime and

they should be convicted. All the drug smugglers around should be told by your actions that bringing in marijuana is wrong.

Defendants objected and moved for mistrial. Their motion was denied and their objection overruled. Subsequently, the District Attorney stated:

Yes, I made some deals, but I think I had a very good reason because, ladies and gentlemen, if Len Clark and Mark Owen, Jeff Levine were the only ones convicted all that would be convicted were some real small fry. However, Sellers and Lee and Nettle are big ones. They are the ones that never seem to get caught.

Defendant Lee's motion for mistrial and objection were denied. The District Attorney continued:

They are the kind that never get caught. * * * if you convict—or if we had charged only Len Clark, Mark Owen, Jeff Levine, we would have very little impact on the drug trade. But if we charge and convict Pat Wright, Jim Nettle, Jeff Lee, Mr. Gene Sellers and Ed Paquette, we can put a sizeable dent, put a sizeable knot in the drug traffic and trade.

Defendants' motions for mistrial by virtue of this statement were overruled. Again the District Attorney later stated

[t]his is not some two-bit case with a small-time pusher selling a little $10 bag of marijuana to somebody on the street. These are importers. They are suppliers. And what you do will have an impact. This is your community's only day in court. It's not only these defendants' only day but it's your community's only day in court. Don't you believe people when they say it doesn't do any good to fight drugs because it does do good. If I didn't believe that I wouldn't be here. Stopping 581,800 cigarettes means something. That many marijuana joints means something, ladies and gentlemen, and you can do it.

What you do as jurors is going to be watched here. You can better believe

that each and every drug smuggler is watching what happens here today.

Further motions for mistrial were denied, but the jury was instructed to disregard comments about the community watching what they were doing. When the prosecutor stated "you certainly aren't controlled by the community but you set the standards for the community," the court interrupted and sustained defendant's objections and instructed the jury that they were not to be guided by public opinion.[5]

As we stated in *Llach, supra:*

Improper statements made by prosecutors during closing arguments have been a persistent problem in this Circuit. We have repeatedly instructed prosecuting attorneys regarding their role in the adversary process and the proper bounds of closing arguments. * * * We must decide whether the objectionable comments were so offensive, when considered in the context of the entire trial, as to deprive Llach of a fair trial.

At 1336. We believe that this argument was an emotional appeal calculated to persuade the jury to decide the case on other than the facts before it. The argument is similar to those condemned in *Brown v. United States*, 370 F.2d 242, 246 (D.C.Cir. 1966) (acquittal would leave police powerless to protect against assaulting police officer with a dangerous weapon and result would be martial law); *United States v. Barker*, 553 F.2d 1013, 1025 (6th Cir.1977) (if defendants are not convicted, the banks might as well be open and people invited to come in and get it); *United States v. Wiley*, 534 F.2d 659, 665 (6th Cir.), ("if this man goes free, you have chalked up one point for the criminal"), *cert. denied*, 425 U.S. 995, 96 S.Ct. 2209, 48 L.Ed.2d 819 (1976). The argument is also improper because of the injection of the District Attorney's personal belief. We said in *United*

*States v. Splain*, 545 F.2d 1131, 1135 (8th Cir.1976):

A personal expression of defendant's culpability, which inserts an extraneous and irrelevant issue before the jury, is particularly objectionable and highly improper when made by the prosecutor, whose position of public trust and experience in criminal trials may induce the jury to accord some unwarranted weight to the comment.

 Where the District Attorney's remarks are prompted by statements of defense counsel, it has been held that there is no reversible error. *United States v. West*, 670 F.2d 675 (7th Cir.), *cert. denied*, 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982) (the integrity of the United States Attorney's office was put in issue); *United States v. Sherer*, 653 F.2d 334, 336 (8th Cir.), *cert. denied*, 454 U.S. 1034, 102 S.Ct. 573, 70 L.Ed.2d 478 (1981) (Assistant United States Attorney's statement about the honesty and diligence of his office was fair reply to defense attorney's closing argument). *See also United States v. Booker*, 706 F.2d 860, 863 (8th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 283, 78 L.Ed.2d 261 (1983); *United States v. Boykin*, 679 F.2d 1240, 1245 (8th Cir.1982); *United States v. Schwartz*, 655 F.2d 140, 142 (8th Cir.1981); *Isaacs v. United States*, 301 F.2d 706, 738 (8th Cir.), *cert. denied*, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962). Where the prosecutor, his witnesses, or the work of government agents is attacked, the District Attorney is entitled to make a fair response and rebuttal. *United States v. Nanez*, 694 F.2d 405, 410 (5th Cir.1982), *cert. denied*, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983); *United States v. Praetorius*, 622 F.2d 1054, 1060–61 (2d Cir.1979), *cert. denied*, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980); *United States v. Hiett*, 581 F.2d 1199, 1204 (5th Cir.1978).

---

5. This portion of the closing argument alone does not constitute reversible error. Unless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible. *United States v. Lewis*, 547 F.2d 1030, 1036–37 (8th Cir.1976), *cert. denied*, 429

U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977); *United States v. Stead*, 422 F.2d 183, 184 (8th Cir.), *cert. denied*, 397 U.S. 1080, 90 S.Ct. 1534, 25 L.Ed.2d 816 (1970). Any error in this regard was cured by the court's prompt cautionary instruction.

Nettle's counsel in argument vigorously attacked the government's plea bargains with Wright, Levine, Owen and Clark in return for their testimony. He described a scene with a government prosecutor and case agents acting as carnival hucksters, "standing on the courthouse steps probably with their straw hats on at the time" offering "today's special" to anyone who would testify against Nettle. He argued that the government had "given unbelievable concessions to people in return for saying what they feel the theory of the case is" and that all the time Wright spoke to the district attorney and "rehearsed his trial testimony" he did just fine. He further argued that "the government sells the courthouse even more after that because they've got Mark Owens." The jury was asked to be outraged by the use of codefendants in plea bargains and told that if they did not feel that what had happened was right, they should find defendant Nettle not guilty.

Lee's counsel argued that the government dropped the serious charges against Wright and let him plead guilty to conspiracy just as it did with Owen and Levine. But at the same time, argued Lee's counsel, the government asked the jury to convict Lee of all four counts. Lee's counsel told the jury that Wright benefited from getting involved in the conspiracy because he was a fugitive and had other charges against him. Because of his testimony in this case, however, he would be walking the streets again in twenty months. Lee's counsel asked the jury how many could honestly say that they wouldn't give a second thought to flying an airplane for a short trip for $50,000 or $60,000. "I think a lot of people would give it serious consideration. A lot of other people would go. ahead and do it."

We believe that the extremely strong argument made by Nettle's counsel attacking the prosecutor, the witnesses, and the work of the government agents fully entitled the District Attorney to make a fair response and rebuttal. The argument based on the story of the District Attorney and the government agents standing on the courthouse steps, in essence, conducting an auction and selling the courthouse in order to get the evidence they wanted, was an invitation to the strong argument made by the District Attorney. As to Nettle, we cannot conclude that the argument constitutes reversible error.

As to Lee, the issue is closer. Nevertheless, Lee's counsel attacked the government for using plea bargains with the individuals. It was argued that the serious charges against Wright had been dropped and that he would be walking the street in twenty months. The argument that Lee for $50,000 or $60,000 did less than many people might, and that even jurors might give second thought to such activity also invited the District Attorney's arguments of which Lee complains. Reversal is appropriate only if the court determines that the jury verdict could reasonably have been affected by the argument. *Splain*, 545 F.2d at 1135. Certainly the substantial involvement of Lee in the conspiracy, as discussed above, leads us to conclude that, beyond a reasonable doubt, any error as to Lee would be harmless. *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

With respect to Paquette, the argument is far more troublesome. While Paquette's counsel pointed out the enormous deal given Wright, his argument did not contain the venom expressed by Nettle's counsel or plant the improper seeds of Lee's counsel's suggestion that even the jury would be tempted. Although Paquette's counsel incorrectly stated Levine's lawyer had let Levine read Wright's statement, we conclude counsel here confused Levine and Owen, who had read Wright's statement before his plea. While counsel here was in error, the argument, read in its entirety, does not justify the responsive argument made by the District Attorney. Although the evidence justified an argument that Sellers, Lee, Wright and Nettle were the big ones (Sellers leased the airport; Lee advanced expense money, worked actively in the airport and knew of the Belize connection; Nettle flew the plane and was

more heavily involved than any of the others; Wright was extensively involved in planning the arrangement and copiloted the plane), by including Paquette along with them, the District Attorney's argument unduly emphasized Paquette's relatively limited contribution toward the conspiracy. Paquette's counsel's argument did not sufficiently provoke the District Attorney's remarks, and Paquette was unfairly prejudiced by the strong closing argument. Although the United States Attorney, as an advocate, is entitled to make a fair response to the arguments of defense counsel, in Paquette's case, the District Attorney's response was not fair. We conclude that the argument constituted reversible error in regard to Paquette.

## VI.

Having considered all of the arguments raised by the defendants, we conclude that the convictions of Nettle and Lee as to all four counts must be affirmed. The forfeiture of the Piper aircraft is also affirmed. We reverse the conviction of Paquette and remand for new trial.

HEANEY, Circuit Judge, concurring.

I concur, but note that Judge McMillian's views in *United States v. Howard*, 706 F.2d 267, 270 (8th Cir.), *cert. denied*, — U.S. ——, 104 S.Ct. 341, 78 L.Ed.2d 309 (1983), with respect to the necessity of a pretrial hearing to establish the existence of a conspiracy reflect my own. I too feel we should change the rule in this Circuit.