

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-22-2001

# Moore v. Morton

Precedential or Non-Precedential:

Docket 98-5429

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Moore v. Morton" (2001). *2001 Decisions.* Paper 137.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/137

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 22, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-5429

CLARENCE MOORE,
        Appellant

v.

WILLIS MORTON, ADMINISTRATOR;
PETER G. VERNIERO, ATTORNEY GENERAL
OF THE STATE OF NEW JERSEY

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 97-cv-02087
(Honorable Stephen M. Orlofsky)

Argued September 16, 1999

Before: SCIRICA, RENDELL and GREENBERG,
Circuit Judges

(Filed: June 22, 2001)

        PAUL J. CASTELEIRO, ESQUIRE
         (ARGUED)
        86 Hudson Street
        Hoboken, New Jersey 07030

         Attorney for Appellant

NANCY A. HULETT, ESQUIRE
 (ARGUED)
Office of Attorney General of
 New Jersey
Department of Law & Public Safety
Division of Criminal Justice,
 Appellate Bureau
P.O. Box 086
Richard J. Hughes Justice Complex
Trenton, New Jersey 08625

 Attorney for Appellees

OPINION OF THE COURT

SCIRICA, Circuit Judge.

Clarence Moore, who was convicted of rape and robbery
and sentenced as a persistent offender to life imprisonment
with twenty-five years of parole ineligibility, appeals from
the denial of his petition for a writ of habeas corpus under
28 U.S.C. S 2254. The principal issue at trial was the
identity of the rapist. The principal evidence was the
victim's post-hypnotic identification. The state prosecutor
made certain improper arguments during jury summation
which were addressed by the trial judge with curative
instructions. The issue on appeal is whether these improper
arguments deprived Moore of his right to a fair trial.

I.

On March 5, 1987, a jury convicted Moore of second-
degree burglary, second-degree robbery, robbery with intent
to commit aggravated sexual assault, and three counts of
aggravated sexual assault. These essential facts were
established at Moore's trial.

> On January 14, 1986, some time after 1:20 a.m., 25-
> year-old M.A. was viciously assaulted by a man in the
> bedroom of her cottage in Somers Point. M.A. went to
> bed that night only to be awakened by a male who
> grabbed her by the neck. The male demanded money,

2

and M.A. removed $8 from her purse and gave it to him. When M.A. could produce no more money, the man became angry. He ordered her to undr ess. Despite the man's assurance she would not be hurt if she did as she was told, the man penetrated her anally after she complied with his directions to roll over on her stomach and then kneel on her hands and knees. The man then ordered her to roll over and he penetrated her vaginally. He then forced her to per form fellatio on him until he ejaculated. Still angered by lack of money, the man forced her to again perfor m oral sex until he achieved an erection. He then order ed her to kneel on the bed and "shake" her rear in the air while someone outside watched. He warned her if she did not do this "he would come back and do it again or kill" her. M.A. remained in her bed for four hours fear ful the man was still in the house.

Finally, she arranged to have the police called and, when the police arrived, M.A. described her attacker . She described him as a black male, about 5'8" to 5'10" tall, late twenties to early thirties, very muscular and strong. . . . She also said her attacker had been wearing blue jeans. Further, she described him as having some facial hair on the sides of his face.

While the bedroom was dark, there was enough outside light "to see a face." Also, although she was not wearing her contact lenses that corrected her nearsightedness, she stated the attacker was "very close" to her, close enough for her to see him and his face . . . . However, M.A. testified she could see without her contacts, that she had driven without them, and her vision did not prevent her from seeing things close to her.

When M.A. could not give the police composite artist sufficient information to develop a composite sketch, she suggested hypnosis, thinking it "might help[her] remember, in more detail, his face." With the aid of hypnotically enhanced memory, she could vividly r ecall her attacker's facial features. She ther eafter was able to positively identify the defendant as her assailant both in court and on three occasions in out-of-court

3

photographic arrays. She described the hypnotic enhancement as making her attacker's face "much clearer" with "the features . . . more detailed." She also testified she initially could not positively r ecognize her assailant without the hypnosis. There is nothing in the record to suggest either the police or the doctor assisting the hypnosis in any way suggested what the assailant might look like.

As a result of the hypnosis, M.A. also r ecalled her assailant wore a tan suede jacket with dirt ar ound the pockets. A subsequently executed search warrant at defendant's residence turned up a tan suede sweater jacket with pockets along with several pairs of blue jeans.

State v. Moore, 641 A.2d 268, 270-71 (N.J. App. Div. 1994) ("Moore II") (alterations in original). At trial, M.A., a Caucasian woman, testified and identified the jacket as the one worn by her attacker.

A portion of the trial consisted of expert testimony on hypnosis.[1] The State's witness, Dr. Samuel Babcock, justified his methodology and maintained that M.A.'s memory was enhanced through hypnosis.[2] Defense witness Dr. William A. Miller testified about the shortcomings of using hypnosis to enhance a victim's memory.

_____

1. Under New Jersey law, "testimony enhanced through hypnosis is admissible in a criminal trial if the trial courtfinds that the use of hypnosis in the particular case was reasonably likely to result in recall comparable in accuracy to normal human memory . . . . The trier of fact must then decide how much weight to accord the hypnotically refreshed testimony." State v. Hurd, 432 A.2d 86, 95 (N.J. 1981).

2. As required under State v. Hur d, a pre-trial hearing was held to determine the admissibility of M.A.'s testimony. 432 A.2d at 95. The Appellate Division affirmed the trial court's ruling that the testimony was
admissible, explaining that it was "satisfied the use of hypnosis was appropriate for the victim's fear-induced traumatic neurosis, . . . and that the trial judge's findings as to the pr ocedures employed and adherence to the Hurd requir ements were supported by substantial credible evidence in the record." Moore has not raised a federal constitutional challenge, in either state or federal court, to the admission
at trial of M.A.'s post-hypnotic testimony.

4

Clarence Moore, an African-American male , did not testify. His wife Cheryl Moore, a Caucasian woman, testified on his behalf. Mrs. Moore testified that she and her husband lived about forty-five minutes from M.A.'s home. Although not recalling the night of the rape in particular, Mrs. Moore testified she would have noticed if her husband were missing for a period of two and a half to three hours in the early morning hours. She testified her baby suffered from a condition called "failure to thrive" which required frequent nursing and that Mr. Moor e assisted her in nursing the baby. Mrs. Moore also testified that at the time of the rape, she was suffering from mastitis, a type of breast infection.

The state trial court observed, "[T]he only r eal question in this case is that of identity." There was no dispute that the victim was sexually assaulted and robbed, and the only "real question" for the jury was whether Moore was the culprit. As the trial court found, the answer tur ned on "whether or not the [hypnotically] enhanced or refreshed recollection [of the victim] [wa]s of sufficient reliable character and with such probative value that the jury should believe [the victim] beyond a r easonable doubt."

The trial lasted more than two weeks and at the conclusion, both the defense and the prosecution delivered summations that lasted two to three hours. In his summation, the prosecutor sought to explain why Mrs. Moore's testimony buttressed the State's case stating, "Based on the testimony of Cheryl Moore, the case is stronger than ever, that the odds ar e that this defendant is the perpetrator [and] . . . you have mor e reason to convict Clarence McKinley Moore now that she has testified than ever." The prosecutor noted that ther e were in fact "three important things" that the jury should lear n from Mrs. Moore's "appearance" as a defense witness.

> Here's where I ask you to really concentrate on my words because if you misunderstand what I'm saying right now, I am going to feel real bad and foolish, and you are too. So let's all understand it like adults.
>
> Race has nothing whatsoever to do with this case, right? Right. We all know that the race of the people

involved does not at all dictate whether he's guilty or anything like that. I mean, let's hope that we all feel that way, whether we are white or black or anything. Okay? So let's clear the air that the statement that I'm about to make has nothing whatsoever to do -- and I hope this machine hears this-- has nothing whatsoever to do with race.

This has to do with selection, okay? Here's what I mean. All of us select people in life to be with based on whatever reason, whether it's people to marry, whether it's friends, whether it's people to associate with, whether it's business people. We all make choices in life that lead us to relationships with others, and those choices may or may not be significant.

Let me show you what I mean. What if you as an individual, whether you're male or a female, decide in your life that you want to live your life with a blonde? You know, you see all of these ads about blondes have more fun and this and that and, again, whether you are male or female or whatever--it can work both ways --and so you become interested in being with blondes because you prefer them. Right? Gentlemen pr efer blondes.

Well, that can be seen, can't it, because maybe the people that you choose to date or marry or be with all appear to be blondes or it might be redheads or it might be green hair. You know, nowadays I guess green is one of the popular colors. It could be anything. You could substitute any color hair or you could substitute any particular trait. Right? It needn't even be color of hair. It could be the color of eyes. It could be a person who likes tall people. I think whoever I should be with should be six foot four. It would make me feel terrific to be with a woman six foot four, or vice versa, a woman could think of a man like that.

You see my point? It's not a statement of race; it's a question of choice, selection of who you might want to be with, whether it is as a mate or a boyfriend or girlfriend or victim. How about that? How about that some people might choose a victim according to the

6

way they look, whether they be blonde or blue or anything else?

So I ask you this: What did we learn when we found out that Cheryl Moore was the wife of the defendant? I suggest to you in a nonracist way that what we found out was that Clarence McKinley Moore made a choice to be with a Caucasian woman --

Moore's counsel objected at that point and moved for a mistrial arguing the reference to race was irrelevant, inflammatory and prejudicial.[3] The trial court denied the motion for a mistrial but admonished the prosecutor at sidebar not to refer to race.[4] The court sustained the objection and instructed the jury:

_____

3. At sidebar, Moore's counsel ar gued,

Your honor, I'm going to ask for a mistrial because if there's no reason that race should be brought into this thing at all, there's nothing probative because of the fact that he's married to a white woman that would suggest that he would then necessarily go out and attack and assault a white woman.

That is precisely what [the prosecutor] is trying to infer here, that because he's married to a white woman and because a white woman has been assaulted, that that necessarily was the selection process that went on in his mind because he couched the question in terms of choice of victims.

There is absolutely no reason to inject race in this case. I stayed away from it, and up until this point in time everybody stayed away from it. The comments that were just elicited by [the prosecutor], it's only done for one purpose entirely, and that's to inflame this jury and to improperly put before them the fact of race as an issue in terms of how this defendant, if in fact he was the perpetrator, selected the victim.

There was no testimony as to that. Ther e was no testimony that he has assaulted other white victims before or anything of that nature, and all of the sudden, only because his wife is white, [the prosecutor] is now trying to infer to this jury that this is a selection, that that is something probative that they can use in making a determination, and I mean, it has no part in this trial. It is highly prejudicial, has no purpose for being other than the purpose that

[the prosecutor] is trying to do, an impr oper inference to this jury, and I would ask the court to declare a mistrial.

4. At sidebar, the trial judge stated:

I will instruct this jury that they are not to consider for any purpose

7

Ladies and gentlemen of the jury, I am ordering you to disregard what the prosecutor said in reference to the testimony, the appearance of Mrs. Moore, she being a white person, a Caucasian, and Mr. Moor e being a black person, and that the reason, the selective process, was that he did this aggravated assault because he selected a white or Caucasian person. Disregard that. That's an unfair and unr easonable inference to be drawn from the testimony and I'm convinced that it's not proper argument to the jury.

The prosecutor then argued:

I say to you that there are two other r easons why you should find that the State's case gets str onger with the testimony of Cheryl Moore. We lear ned that on December 4, 1985, the defendant's wife gives birth to a child. She further tells you that from that time on up until the time he's arrested, she's disabled. I mean, she has bleeding breasts.

I ask you to consider that and infer that that would give believability to the fact that during that period of time, that is, on January 14, 1986, right in the middle of the time after the birth of the child and the disability of the wife, I ask you to infer that that is a period of time when this individual would have his greatest need for sexual release.

Moore's counsel objected and renewed his motion for a mistrial. He noted that there was no evidence in the record

_____

any suggestion of any racial impropriety, they are not to decide this matter on prejudice, bias or . . . anything to do with race. I am also going to tell this jury to disregard that argument and I'm going to tell the prosecutor that you are not to r efer to that area.

I am convinced that summation is to argue the facts that were adduced from the witness stand. I am also convinced that it is not a reasonable inference to draw from the fact that this defendant is married to a white women that he selectively made that decision to rape or rob, [and] . . . sexual[ly] assault, a white woman. I don't think that's a reasonable inference that can be drawn from the selective process, and I'm going to so instruct the jury.

8

"to even suggest that [Moore] couldn't have had sexual relations with" his wife during the period of time in question. The trial court denied the motion for a mistrial, and repeated its warning to the pr osecutor "to stay away from the area of white/black because I don't think that's in the case."[5] The court sustained the objection to the inference and instructed the jury:

> Ladies and gentlemen of the jury, I'm going to or der you to disregard that last statement of the prosecutor. I don't believe a reasonable inference can be drawn in that vein, that because there was not access--and I'm not even sure there was--but because Mrs. Moore testified that she had this mastitis, that that would give the defendant that impetus to do something. That's an improper inference. You are to disregard that.

Undeterred, the prosecutor concluded with a third improper remark[6] to the jury:

_____

5. At sidebar, the trial judge stated:

> I want you to stay away from the areas of white/black because I don't think that's in the case; two, the reason that he could possibly rape some woman because of the wife or anything dealing with the reason the wife--which would give reason fr om him to do something because he was unable to satisfy his needs at home or anything in that vein. I don't think it's part of this case.

6. Prior to this third remark, the pr osecutor told the jury that M.A. had been victimized beyond her rape by the investigative and trial process. Defense counsel objected to this comment and also objected to a perceived implication that Moore did not testify in his defense. After another sidebar conference, the trial judge issued the following curative instruction:

> Ladies and gentlemen of the jury, there has been some reference to the fact that [the defendant] only called two defense witnesses. I want to tell you -- and I'll tell you in the general context of my charge later on -- that the defendant is under an obligation to do nothing. The defendant need not call any witnesses.
>
> I indicated that to you earlier on when we first got here. The defendant can stand mute and not say anything and you are not to take any unreasonable -- any inference from that at all.

9

The last thing I have to say is that if you don't believe [M.A.] and you think she's lying, then you've probably perpetrated a worse assault on her.

The court dismissed the jury for the day, advising counsel it would charge the jury the next mor ning. Immediately thereafter, Moore's counsel raised an objection and renewed his motion for a mistrial, ar guing the comment regarding "perpetrating a worse assault" on M.A., particularly when viewed in connection with the prosecutor's earlier comments, requir ed a mistrial.

The trial court denied the motion for a mistrial, explaining the comment about "perpetrating a worse assault" on M.A. was "tangentially dealing with credibility." But the court informed counsel that, "in or der to insure fairness," it would nevertheless instruct the jury to disregard the remark. The court issued the following instruction the next morning:

Before I [charge you], I want to tell you I'm going to order you—-I generally don't order people. I'm going to order you to disregard that last r emark made by [the prosecutor] to the effect that the last thing I have to say to you is that if you don't believe her and you think she's lying, then you're probably perpetrating a worse assault on her.

Disregard that remark. I have deter mined that's improper and you are not to consider that for any purpose in this case.

The court charged the jury without objection. The jury returned a verdict of guilty on all counts. At sentencing, the trial court granted the State's motion to tr eat Moore as a "persistent offender," and imposed an extended term of life imprisonment with twenty– five years of par ole ineligibility. See N.J. Stat. Ann. S 2C:44–3a (W est 2001). Moore's sentence was predicated on a 1968 conviction for carnal abuse, eight convictions in 1970 for burglary, and a 1976 conviction for distribution and possession with the intent to distribute marijuana. These prior convictions, along with his immediate conviction for burglary, r obbery and three separate counts of aggravated sexual assault, placed him under New Jersey's persistent offender category. State v.

10

Moore, A-1910-87Ta, slip op. at *7-8 (N.J. Super. Ct. App. Div. April 1, 1991) ("Moore I").

On direct appeal to the Appellate Division, Moore, now represented by the public defender , claimed among other things, that "the prosecutor's summation exceeded the bounds of propriety making it impossible for the defendant to receive a fair trial." Id. at *2. In support, Moore cited the references in the state's summation about the "selection process," the "need for sexual release," and the remark about "perpetrating a worse assault on the victim." The Appellate Division rejected Moore's claim on the merits. Although it found the prosecutor's "outrageous conduct violated ethical principles" and "showed a disregard of the obligation of the prosecutor to play fair and see that justice is done," the Appellate Division ruled that, within the context of the trial, the trial judge's "for ceful" instructions to the jury cured the harm that was done. Id. at *4. Moore received new counsel from the public defender's office, and filed a petition for certification to the New Jersey Supreme Court presenting his due process claim and additional allegations of prosecutorial misconduct. The New Jersey Supreme Court declined review, and denied Moore's motion for reconsideration.

In 1992, still represented by the public defender who filed the petition for certification, Moore filed a motion for state post-conviction review claiming, inter alia , he was denied his Sixth Amendment right to effective assistance of counsel on direct appeal because counsel failed to raise due process claims resulting from the following allegations of prosecutorial misconduct: (1) improper r eference to matters outside the evidence and stating his personal opinion on the veracity of witnesses and the defendant's guilt; (2) misstating the law and diluting the burden of proof by informing the jury that reasonable doubt meant "the odds are" the defendant did it; and (3) disparaging and ridiculing the defense and defense counsel. The trial court, without holding an evidentiary hearing, denied the petition as procedurally barred and without merit. On appeal, the Appellate Division highlighted some of the pr ocedural infirmities, but chose to reject Moor e's claim on the merits. The Appellate Division ruled that, even if Moor e's counsel

11

had properly raised every instance of alleged prosecutorial misconduct on direct appeal, it would have concluded that Moore had a fair trial, and was not denied ef fective assistance of counsel. Moore II, 641 A.2d at 268. The New Jersey Supreme Court denied Moore's petition for certification.

In April 1997, no longer represented by the public defender's office, Moore timely filed a counseled habeas corpus petition under 28 U.S.C. S 2254 in the United States District Court for the District of New Jersey. He raised the following claim:

> The deliberate and continuous misconduct by the prosecutor which included racist rationales to justify the conviction of the African-American petitioner of raping a white woman, statements that reasonable doubt meant that the `odds are' that the petitioner committed the offense, statements that defense counsel didn't care about justice and was only trying to `sell' reasonable doubt and a warning to the jury that if they acquit the petitioner they will have perpetrated an assault upon the victim, worse than her rape, deprived petitioner of his right to a fair trial.7

After reviewing the record, and finding the prosecutor's conduct "offensive and unprofessional," the District Court held that "the Appellate Division's opinions on direct appeal

_____

7. In this appeal we will only address Moor e's federal due process claim with respect to the instances of prosecutorial misconduct that he raised at each level of review before the New Jersey courts (i.e. the prosecutor's
"selection" argument, the "sexual r elease" argument, and the comment regarding "perpetrating a worse assault on the victim"). The remaining factual predicates were not fairly pr esented to the New Jersey courts in support of his due process claim. Therefor e to the extent Moore seeks relief based on other allegations of pr osecutorial misconduct, these claims are unexhausted, and now procedurally defaulted. O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999) ("Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court."); McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999) (to "fairly present" a federal constitutional claim, a petitioner must
present the claim's "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted") (citing Anderson v. Harless, 459 U.S. 461 (1982)).

12

and on post-conviction relief clearly consider ed the weight
of the evidence in evaluating Moore's claim." State v. Moore,
No. 97-2087, slip op. at *17 (D.N.J. Aug. 12, 1998) ("Moore
III"). The District Court concluded it was not an
"unreasonable application of clearly established federal law"
for the Appellate Division to hold the evidence could
support the jury's verdict and "the pr osecutor's conduct,
considered within the context of the entir e trial -- including
the judge's curative instructions, the evidence and the
correct jury charge -- did not `infect the trial with
unfairness.' " Id. at *18 (citing 28 U.S.C. S 2254(d)(1) (as
amended by the Anti-Terrorism and Ef fective Death Penalty
Act)). The District Court noted,

> Were I sitting as an Appellate Court judge on direct
> review of the trial below, I might well have concluded
> that the prosecutor's misconduct deprived Moor e of his
> right to a fair trial. Congress, however , has imposed a
> much more demanding standard of review on federal
> habeas corpus courts. The Appellate Division
> considered the issue presented to me on two occasions
> and concluded that Moore was not denied a fair trial.
> After a complete review of the trial recor d, I cannot
> conclude that the state court's analyses wer e "an
> unreasonable application of clearly established federal
> law."

Id. at *19.

II.

The District Court had jurisdiction under 28 U.S.C.
S 2254(a) and granted a certificate of appealability under 28
U.S.C. S 2253. We have jurisdiction under 28 U.S.C.
SS 1291, 2253. Because the District Court r elied exclusively
on the state court record and did not hold an evidentiary
hearing, our review of its decision is plenary. Hartey v.
Vaughn, 186 F.3d 367, 371 (3d Cir . 1999), cert. denied, 528
U.S. 1138 (2000).

III.

A state prisoner's habeas corpus petition "shall not be
granted with respect to any claim that was adjudicated on

13

the merits in State court proceedings unless the adjudication of the claim-- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. S 2254(d)(1). "[S]ection 2254(d) fir mly establishes the state court decision as the starting point in habeas r eview." Matteo v. Superintendent, SCI Albion, 171 F .3d 877, 885 (3d Cir.) (en banc), cert. denied, 528 U.S. 824 (1999).

In Williams v. Taylor, 529 U.S. 362, 404-06 (2000), the Supreme Court held that "contrary to" and"unreasonable application of " have independent, if overlapping meanings. To hold a state court decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," a federal court mustfind the state court arrived "at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or that the state court confronted facts "materially indistinguishable from a relevant Supreme Court pr ecedent" but arrived "at a result different from" that reached by the Supreme Court. Id. at 404-09. The Court explained that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would notfit comfortably within S 2254(d)(1)'s `contrary to clause,' " but that, as an example, a state court decision applying a burden of proof other than that required by Supreme Court precedent would be contrary to clearly established federal law as determined by the Supreme Court. Id. at 406.

Even if a state court judgment is not contrary to Supreme Court precedent, it may be an unr easonable application of that precedent. Id. at 407-08. To hold that a state court's decision is an unreasonable application of "clearly established Federal law, as deter mined by the Supreme Court of the United States," we mustfind that (1) the state court identified "the correct governing legal rule from [the Supreme] Court's cases but unreasonably applie[d] it to the facts" of the particular case, or (2) the state court unreasonably extended or failed to extend a legal principle from the Supreme Court's precedent. Id. at 407. "[A] federal habeas court making the`unreasonable application' inquiry should ask whether the state court's

14

application of clearly established federal law was objectively unreasonable." Id. at 409. The federal court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

"[C]learly established Federal law, as deter mined by the Supreme Court of the United States" r efers to Supreme Court "holdings, as opposed to the dicta," as of the time of the relevant state court decision.8  Id. at 412. Supreme

_____

8. In determining whether a state court unr easonably failed to apply federal law, the Supreme Court instructed,

> [T]he "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case.
>
> * * *
>
> The term "unreasonable" is no doubt difficult to define. That said,

it

> is a common term in the legal world and, accor dingly, federal

judges

> are familiar with its meaning. For purposes of today's opinion, the most important point is that an unreasonable application of federal law is different from an incorr ect application of federal law.

Williams, 529 U.S. at 409-10 (emphasis in original).

In interpreting the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") in a different context we recently stated, "We find no indication that AEDPA eliminated the r ole of the lower federal courts in interpreting the effect of Supreme Court pronouncements." West v. Vaughn, 204 F.3d 53, 62 n.10 (3d Cir. 2000) (discussing traditional retroactivity analysis in light of AEDPA). Similarly in Matteo, 171 F.3d 890, we held,

> [A]lthough AEDPA refers to "clearly established Federal law, `as determined by the Supreme Court of the United States,' " (citation omitted), we do not believe federal habeas courts ar e precluded

from

> considering the decisions of the inferior federal courts when evaluating whether the state court's application of the law was

Court precedent which would have been consider ed an "old
rule" under Teague v. Lane, 489 U.S. 288 (1989), is also
"clearly established Federal law, as deter mined by the
Supreme Court of the United States."9 Id.

IV.

With this standard of review in mind, we will examine
Moore's claims that the prosecutor's summation deprived
him of a fair trial.

A.

The conduct of the trial, including closing ar guments, is
regulated under the sound discretion of the trial judge.
Herring v. New York, 422 U.S. 853, 862 (1975). But
prosecutorial misconduct may "so infect[ ] the trial with
unfairness as to make the resulting conviction a denial of
due process." Donnelly v. DeChristofor o, 416 U.S. 637, 643

_____

> reasonable. See O'Brien v. Dubois, 145 F.3d 16, 25 (1st Cir. 1998)
> ("To the extent that inferior federal courts have decided factually
> similar cases, reference to those decisions is appropriate in
> assessing the reasonableness vel non of the state court's treatment
> of the contested issue.") . . . . [I]n certain cases it may be
> appropriate to consider the decisions of inferior federal courts as
> helpful amplifications of Supreme Court pr ecedent.

9. In Hameen v. State of Delaware, we recently applied the Supreme
Court's Williams test. 212 F.3d 226 (3d Cir. 2000), cert. denied, 121
S.Ct.
1365 (2001). In Hameen we determined the Delaware Supreme Court's
application of a retroactive amendment to the state death penalty law
was not a violation of the Ex Post Facto Clause of the United States
Constitution because it was not "contrary to" clearly established federal
law. In coming to this determination we detailed at length the Supreme
Court's ex post facto precedent and stated we"simply cannot find . . .
the decision of the Supreme Court of Delawar e . . . contrary to any [of
these cases]. . . . In the circumstances, if we found an ex post facto
violation here, we surely would be unfaithful to our obligations under the
AEDPA." Id. at 246. After reviewing Supreme Court jurisprudence in this
area we also determined there was"no basis to hold that the Delaware
Court unreasonably applied the Supreme Court's ex post facto cases to
the facts of this case or unreasonably r efused to extend ex post facto
principles to this case." Id. (citing Williams, 529 U.S. 362).

16

(1974). Such misconduct must constitute a " `failure to observe that fundamental fairness essential to the very concept of justice.' " Id. at 642 (quoting Lisenba v. California, 314 U.S. 219, 236 (1941)). Where "specific guarantees of the Bill of Rights are involved,[the Supreme] Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them," id. at 643, but the test remains the same. See Dar den v. Wainwright, 477 U.S. 168, 182 (1986), reh'g denied, 478 U.S. 1036 (1986).

In Donnelly, a first-degree mur der prosecution, the Court addressed an improper remark by a state prosecutor during jury summation. The trial court later gave the following curative instruction as part of the jury char ge:

> Closing arguments are not evidence for your consideration . . . . Now in his closing, the District Attorney, I noted, made a statement: "I don't know what they want you to do by way of a verdict. They said they hope that you find him not guilty. I quite frankly think that they hope you find him guilty of something a little less than first-degree mur der." There is no evidence of that whatsoever, of course, you are instructed to disregard that statement made by the District Attorney. Consider the case as though no such statement was made.

Id. at 641.

The Supreme Court rejected the defendant's claim for federal habeas relief, finding that an "examination of the entire proceeding" did not support the contention that the "prosecutor's remark . . . by itself so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id. at 643. The Court noted that, although the prosecutor's statement was improper , it was not so prejudicial that its effect could not be mitigated by a curative instruction. Finding the trial court had issued a "strong" instruction, twice stating the prosecutor's arguments were not evidence and dir ecting the jury to disregard the offensive statement in particular, the Court held any prejudice had been cured. Id. at 643-44. The Court further explained the prosecutor's comment was

17

"admittedly an ambiguous one," id. at 645, and the case was not one "in which the prosecutor's r emarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right." Id. at 643 (citing Griffin v. California, 380 U.S. 609 (1965)).

In Darden, the prosecutor made several improper remarks during closing argument, including using defense counsel's term "animal" to refer to the defendant and making "several offensive comments r eflecting an emotional reaction to the case." 477 U.S. at 180 & nn. 9-12. The state jury convicted the defendant of murder and assault with intent to kill and recommended a death sentence. The Supreme Court affirmed the denial of the defendant's federal habeas petition. Although the Court found the closing "deserve[d] the condemnation it has received from every court to review it," id. at 179, the Court concluded that, when viewed in context, the comments "did not manipulate or misstate the evidence, nor . . . implicate other specific rights of the accused." Id. at 182. The Court noted the trial court had "instructed the jur ors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence." Id. Moreover, the Supreme Court found "[t]he weight of the evidence against petitioner was heavy; the overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges, .. . reduced the likelihood that the jury's decision was influenced by the argument." Id. (internal quotes omitted).

To the extent that we may discern, ther efore, Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant. Ther e are "some occurrences at trial [that] may be too clearly prejudicial for . . . a curative instruction to mitigate their effect."10 Donnelly , 416 U.S. at 644; cf. Bruton v. United

_____

10. Other courts of appeals have set forth tests for determining whether prosecutorial misconduct violates a defendant's right to due process.

States, 391 U.S. 123, 135 (1968) (admission of codefendant's inculpatory confession too prejudicial to be cured through jury instruction). In making this determination, Supreme Court precedent requires the reviewing court to weigh the prosecutor's conduct, the effect of the curative instructions and the strength of the evidence. Darden, 477 U.S. at 182; Donnelly, 416 U.S. at 163.

B.

1.

We now examine whether the Appellate Division's judgment was contrary to clearly established federal law as determined by the Supreme Court of the United States or an unreasonable application of federal law as determined by the Supreme Court of the United States. Williams, 529 U.S. at 404–09. The Supreme Court has noted that in addressing whether or not prosecutorial misconduct has denied a defendant of a fair trial, "the pr ocess of constitutional line drawing . . . is necessarily imprecise." Donnelly, 416 U.S. at 645. Here, the New Jersey Appellate Division examined each of the prosecutor's challenged arguments and, although finding them impr oper, held that when examined in light of the entire trial and the trial court's curative instructions, Moore had not been deprived of a fair trial. This was the correct analysis under Supreme Court precedent. Darden, 477 U.S. at 183; Donnelly, 416

_____

See, e.g., United States v. Melendez, 57 F.3d 238, 241 (2d Cir. 1995) (examining severity of misconduct, curative instructions and evidence); United States v. Capone, 683 F.2d 582, 585 (1st Cir. 1982) (looking at severity of conduct, whether it was purposeful, ef fect of curative instruction, and strength of evidence). Some courts have also discussed "incurable errors." See, e.g.,Floyd v. Meachum, 907 F.2d 347, 356 (2d Cir. 1990) (granting habeas petition under pr e-AEDPA standard in part because prosecutor's remarks that defendant was a liar and her repeated references to the Fifth Amendment wer e incurable error under Donnelly). But under Williams, 529 U.S. 362, we must determine whether the reviewing courts unreasonably applied federal law as determined by the Supreme Court.

19

U.S. at 163. Furthermore, because we have found no Supreme Court cases with facts "materially indistinguishable" from those at hand, we hold the state court's decision was not contrary to clearly established federal law. Williams, 529 U.S. at 404-09.

2.

Whether the Appellate Division unreasonably failed to apply clearly established federal law as deter mined by the Supreme Court is a more difficult question. The Appellate Division twice concluded that there was sufficient evidence to support Moore's conviction. See Moor e I, slip op. at *11 ("In ruling on the motion for a new trial the trial judge made a careful analysis of the evidence with r espect to the ability of the victim to have seen and identify her assailant. An examination of the record fully substantiates his recital and satisfies us that the conviction is supported by substantial credible evidence . . . ."). Specifically addressing the credibility of M.A.'s post-hypnotic identification, the Appellate Division stated, "There is nothing in the record to suggest either the police or the doctor assisting the hypnosis in any way suggested what the assailant might look like." Moore II, 641 A.2d at 271.

Addressing the prosecutorial misconduct claims in particular, the Appellate Division held,"An examination of the [prosecutor's] summation in its entir ety shows that the complained of comments represented a small portion of an extremely lengthy summation, are too br oadly characterized by defendant and were in each case promptly and appropriately dealt with by a forceful curative instruction." Moore I, slip op. at *4. As to the pr osecutor's argument that the jury should infer that Moore selected a white woman to rape because his wife is white, the Appellate Division explained that "the impropriety of the suggestion was forcefully expressed" by the trial judge when he told the prosecutor at sidebar that the inference was unreasonable. Id. The Appellate Division noted the trial judge"immediately gave a forceful and complete curative instruction which not only told the jury to disregard the pr osecutor's remarks but told them it was an unfair and unreasonable inference and an improper argument." Id. at *5. The court was "satisfied

20

that [the trial judge's action] prevented the prosecutor's statement from substantially prejudicing defendant's right to a fair trial." Id.

As to the prosecutor's argument that Moor e committed the rape because he had his "greatest need for sexual release" while his wife was ill, the Appellate Division noted that the trial judge issued a "curative instruction in which he told the jury to disregard the pr osecutor's statement; that it was an unreasonable and improper inference." Id. at *5-6. The Appellate Division was "satisfied that any possible prejudice was fully removed by the trial judge's prompt action." Id. at *6. And as to the final remark-- that the jury would probably perpetrate a "worse assault" on M.A. if they failed to believe her testimony-- the Appellate Division noted that "[o]nce again the jury was instructed to disregard the comment, that it was impr oper." Id. at *6-7. The court was "satisfied the judge's action her e, as with the previous improprieties, prevented the prosecutor's statements from substantially prejudging the defendant." Id. at *7.

In conclusion, the Appellate Division noted the following:

> Although we are persuaded that the prosecutor's comments did not deprive defendant of a fair trial, we would be derelict if we did not express our disapproval in the strongest terms. The summation showed a disregard of the obligation of the pr osecutor to play fair and see that justice is done. [citation omitted]. Our role, however, is not to supervise or punish prosecutorial misconduct. It is to examine the trial for fairness. Fortunately, the judge, unlike the prosecutor, was sensitive to the need for a fair trial and pr omptly and forcefully delivered curative instructions to the jury.

Id. The Appellate Division noted its view that "the prosecutor's outrageous conduct violated ethical principles," and "urge[d] the Attorney General to bring the matter to the attention of the appropriate ethics body." Id.

The State maintains the Appellate Division's judgment "cannot be seen as unjustified" or unr easonable under Donnelly and Darden. Br. for Appellee at 37. Although the

21

Appellate Division correctly identified the governing federal law for prosecutorial misconduct claims, see Darden, 477 U.S. at 182; Donnelly, 416 U.S. at 644, the question is whether it failed to reasonably apply that law to the facts of this case.

The sole issue at trial was the identity of the rapist. It is undisputed that M.A.'s initial description of her attacker was vague. The morning after the rape she told police that she had only seen him "from the light outside" her apartment which came from street lights on the road and from lights in a hospital parking lot half a block away. M.A. acknowledged at trial that she had her eyes closed most of the time during the attack and that she was "scar ed to death." She also testified that her attacker told her to keep her eyes closed and that he "kept telling me that he had a knife and if I didn't do what he said that he would hurt me." She noted that she only had a "very fleeting opportunity" to see her attacker, but at"one point when he was standing over the bed, I saw his face." M.A. stated he was "close enough to see, but not in detail." She stated that even though she was not wearing her contact lenses during the attack, her attacker was "very close" to her – close enough for her to see him and his face. She stated that she could see certain things without her contact lenses– that she had driven without them and that her vision did not prevent her from seeing things close to her.

Although in her initial statement to police the day after the rape she stated her attacker "may have been black," in a written statement to police that same day she described her attacker as "black, about 5'10", 175 lbs., late 20's to mid 30's. Short hair, short beard close to his face. He was wearing blue jeans." She also stated, "Y ou could tell he was black" because of his "tough street talk." She described her attacker's build as "medium, muscular. Not bulky, just muscular."

Because of her limited opportunity to view her attacker, M.A. suggested to police that she might be able to remember him in more detail if she wer e hypnotized. Three weeks after the rape, the Somers Point Police arranged an appointment with Dr. Samuel Babcock, a clinical psychologist, for M.A. to be hypnotized. Befor e the hypnotic

22

session with Dr. Babcock, M.A. had not identified Moore as her attacker. M.A. testified that the police did not show her photographs of potential suspects before the hypnotic session. In accordance with New Jersey law, Dr . Babcock taped his meeting with M.A. The transcript of his meeting was produced at trial and portions of the audio tape were played for the jury. Part of this evidence consisted of M.A.'s pre-hypnotic description to Dr. Babcock of her limited ability to see her attacker. She said, "There's not much [light], some, a little bit of light comes thr ough the window but there was no light in my house, no lights were on it's pretty dark." When asked how much light came through her window she stated, "Ah, not very much, its enough to see like shadows and stuff, but not . . . . Like outlines of things, you know, but uhm, nothing really you know, not like ahm, nothing in detail." In her pre-hypnotic interview with Dr. Babcock, she also stated that her attacker's face was "round, . . . he had a short bear d, meaning facial hair as though he hadn't shaved in a few days. He was about five-foot-eleven."

After undergoing hypnosis, M.A. was able to r ecall that her attacker's skin color was "medium." She testified that "[w]hen I was hypnotized, I saw his face again just like I had seen it, but it was much clearer." Immediately after the hypnotic session, M.A. met with a state police sketch artist and described her attacker. The sketch artist testified that as a result of the hypnosis, M.A.'s memory was"definitely enhanced" and she was "surer of particular . . . information . . . . [S]he told me that she remember ed better." He said M.A.

> described the person or the perpetrator of the crime as being a Negro male, approximately twenty-eight years old, approximately one hundred eighty pounds, approximately five[-]foot[-]eleven, muscular build, medium complexion. She remembered his eyes as approximately being dark. She remember[ed] stubble on his face and the hair as being black and short with tight texture.

In addition to recalling more specific features of her attacker during hypnosis, M.A. remember ed her attacker had worn jeans and a tan suede jacket with a zipper.

23

Several days later she also recalled there was dirt or a stain near one of the pockets of her attacker's jacket.

With the assistance of M.A.'s "sketch," the police arranged a photo line-up of possible suspects that included a photograph of Clarence Moore. Police included Moore in this line-up because he was a suspect in two other sexual assault cases in Somers Point. Moore was also awaiting trial on sexual assault charges in Cape May County.

M.A. immediately recognized the photograph of Clarence Moore during the photo line-up. But the two other sexual assault victims from Somers Point could not identify him. In a written statement to police following this photo line-up, M.A. stated,

> On February 5, 1986, at 12:40 A.M., I was shown a photo line-up consisting of six photographs of black men by Capt. Lukasiewicz and Sgt. Kaufman. After carefully viewing these photographs, I picked photo #2 [the photo of Clarence Moore] as the man who sexually assaulted me. I am absolutely sure of this identification.

After this initial photo identification, the police executed a search warrant at Moore's home. They found a pair of jeans and a jacket with a suede front and "sweater material" on the collar, back and sleeves. The jacket had stains on the front. M.A. had not mentioned to police that her attacker's jacket had sweater material on the sleeves. Additionally, M.A. described the jacket as "tan," but a state police laboratory that conducted tests on the jacket said it contained "orange fibers."

On October 9, 1986, almost nine months after the initial identification of Moore, M.A. again met with the Somers Point Police and the Atlantic County Prosecutor's office and was shown a series of different photographs of suspects including a more recent photograph of Clarence Moore (the previous photograph had been taken two years earlier). The officers present at this viewing testified that M.A. immediately identified Clarence Moore as her attacker. After this identification, the officers showed M.A. a third series of photographs from a live line-up of suspects that were in a different order from the suspects in the previous

24

photographs. M.A. again identified Clarence Moore as her attacker.

The investigating officers and those present during M.A.'s out of court identifications testified at trial. Defense counsel cross-examined these witnesses about the identification procedures. The officer who conducted the first photo line-up described the procedures he employed in selecting photographs for the identification stating,

> I obtained five other photographs of people that appeared similar in physical appearance [to Moore]. With those I then photographed all six separately so they would all be of the same general size and color hue. I then placed them into a folder that has squar es cut out so that only the face was showing.

He also testified that he chose the photographs in the line-up by going through a large stack of photographs at the police station and that he "tried to pick out the pictures that most closely resembled Mr. Moor e." He testified that during the identification, M.A. immediately picked out Moore's photo and said, " `I'm sur e that's him. I'll never forget his face. I see it every time I close my eyes.' "

Dr. Samuel Babcock testified at trial about the procedures he employed in hypnotizing M.A. During cross-examination, Dr. Babcock was questioned about his methodology, specifically whether his procedure relied on suggestive forms of questioning to enhance r ecall.11

_____

11. Defense counsel questioned Dr. Babcock about confabulation, where a person under hypnosis may unconsciously fill in memory gaps with suggested information. Defense counsel suggested that authorities within the scientific community believed the mor e assertive and dominant the hypnotist, the greater likelihood the hypnotized subject would experience confabulation. Defense counsel questioned Dr. Babcock about how assertive he was with his patients. He also questioned Dr. Babcock about the age r egression technique of hypnosis he employed in hypnotizing his clients, and whether he was aware that some authorities believed this technique resulted in a greater number of subjects experiencing confabulation. Dr. Babcock responded to these questions by acknowledging the scholarly criticism of suggestive questioning and its impact on confabulation. However , he stated,

25

At trial M.A. testified that when she was sexually assaulted she was able to look at the person who attacked her and was able to see his face. She stated she was able to see him "clearly," and that after being hypnotized, "I saw his face again just like I had seen it, but it was much clearer." In describing her identification of Moore at the initial photo line-up, M.A. testified, "As soon as I saw number two [Moore], I recognized him." In testifying about the second photo identification, M.A. said, "I immediately recognized the man who assaulted me." She testified that the other photographs in the line-up did not look very different from Moore but she knew Moore because "that is the same face that I saw that night. I recognize that face, everything about it." Finally, M.A. identified Moore during an in-court identification stating there was no question whatsoever in her mind that he was her attacker .

The state recovered physical evidence, including various articles of clothing and blankets from M.A.'s apartment, and sent this evidence to a crime laboratory for DNA testing. The laboratory also examined hair, saliva and blood samples from both M.A. and Moore. After testing this material, the laboratory issued a report stating, "An insufficient amount of high molecular weight human DNA was isolated from the vaginal swabs, fitted sheet, beige blanket, yellow blanket and the light blue comforter therefore no comparisons could be made with blood from Clarence Moore."

C.

As noted, the quantum or weight of the evidence is crucial to determining whether the prosecutor's arguments during summation were so prejudicial as to result in a denial of due process. Darden, 477 U.S. at 182; Donnelly,

_____

I keep low key, I do not lead the person. I only ask them to continue
their own narrative, asking questions within their narrative but
without pressure. If I feel that they'r e not giving an answer, I'll back
off the question. Perhaps I may come back to it later, but I do not
do it in any kind of a pressure situation.

26

416 U.S. at 644. The Appellate Division analyzed the "incurability" of the prosecutor's r emarks within the context of the entire trial and specifically examined the weight of the evidence.12 Moore I, slip op. at *11; Moore II, 641 A.2d at 124. Although M.A.'s identification of Moor e was post-hypnotic, the New Jersey courts have validated this form of identification.13 The New Jersey courts reviewed this

_____

12. M.A.'s description of Moore as her attacker cannot be corroborated by other witnesses. But corroborating witnesses are usually unavailable in cases involving sexual assault. It is the duty of the fact finder to assess the credibility and reliability of the victim's testimony. Moore's attorney cross-examined M.A. on her identification and the jury found her identification reliable. The trial court and Appellate Division held, if
the jury found M.A.'s identification reliable, there was sufficient evidence
to sustain Moore's conviction. Moor e II, 641 A.2d at 124-25.

13. As recently as 1996, the New Jersey Supr eme Court declined to adopt a per se rule prohibiting hypnotically induced testimony. State v. Fertig, 668 A.2d 1076, 1081-82 (N.J. 1996). The court reasoned that although many state courts prohibit hypnotically induced testimony, other courts have evaluated post-hypnotic testimony under a totality of the circumstances test or have consider ed other factors, including "procedural safeguards similar to those in Hurd to determine case-by-case whether hypnotically-refreshed testimony is admissible." Id. at 1081. The court noted that twenty-six courts have found hypnotically refreshed testimony per se inadmissible while only four states, North Dakota, Oregon, Tennessee and Wyoming, find it generally admissible. The court also noted that the expert whose r ecommendations they relied upon in Hurd to determine the admissibility of hypnotically induced testimony now believes that "procedural safeguards cannot fully protect against the admission of [some improper] testimony . . . . [Therefore] hypnosis should not be used to prepare a witness to testify in court, . . .
in an attempt to improve the recall of a previously unreliable or uncertain witness." Id. (quoting Martin T . Orne, et al., Hypnotically Induced Testimony in Eyewitness Testimony: Psychological Perspective 171, 205 (Gary L. Wells & Elizabeth F . Loftus, eds. 1984)). But the New Jersey Supreme Court commented that many federal courts, including the Courts of Appeals for the Fourth, Fifth, Seventh, Eighth and Eleventh Circuits, and several state courts, including courts in Alabama, Colorado, Florida, Mississippi, New Mexico, South Dakota and Wisconsin, determine on a case-by-case basis whether hypnotically refreshed testimony is sufficiently r eliable to be admissible. Id. at 1081.
The New Jersey Supreme Court stated, "These courts recognize, as we did in Hurd, that a per se inadmissible rule may exclude otherwise

27

evidence and found nothing in the recor d suggested that either the police or Dr. Babcock suggested what the assailant looked like. Moore I, slip op. at *10. The Appellate Division noted,

> Following a thorough Hurd hearing, the trial judge found that all the standards set forth by the[New Jersey] Supreme Court had been fully complied with. We are satisfied the use of hypnosis was appropriate for the victim's fear-induced traumatic neur osis, and that the trial judge's findings as to the pr ocedures employed and adherence to the Hurd requirements were supported by substantial credible evidence in the record.

Id.

The Appellate Division concluded the evidence was"more than sufficient" to support a finding of guilt. Moore I, slip op. at *11; Moore II, 641 A.2d at 124. But finding the evidence "more than sufficient" for conviction does not necessarily end the constitutional inquiry. Although the jury found Moore guilty beyond a reasonable doubt, the Supreme Court requires the reviewing court to factor the prejudicial effect of the prosecutor's improper remarks into the jury's finding of guilt and then assess its impact. Taking into consideration the quantum of evidence properly presented, the due process inquiry r equires the reviewing court to determine whether the prosecutor's remarks were so prejudicial, even in light of the curative instructions, as to result in the denial of the right to a fair trial. When the evidence is strong, and the curative instructions adequate,

_____

reliable evidence." Id. In Fertig, however the court added an additional procedural safeguard stating, "When trial courts admit hypnotically-refreshed testimony, they should instruct the jury of the effect that hypnosis may have on that testimony." Id. at 1082.

In this case, the trial court conducted the appr opriate Hurd hearing to determine the admissibility of M.A.'s post-hypnotic identification and instructed the jury that they could consider this testimony if they found it reliable. Of course, Fertig's requirement that the jurors be instructed about the effect hypnosis may have on testimony was inapplicable at the time of Moore's trial.

28

the Supreme Court has held the prosecutor's prejudicial conduct does not deprive a defendant of a fair trial. Greer v. Miller, 483 U.S. 756, 767 n.8 (holding evidence "primarily consisting of detailed testimony [of a co-conspirator who had confessed to the crime] which was corr oborated by physical and other testimonial evidence" was str ong enough to support conviction despite prejudicial comments), reh'g denied, 483 U.S. 1056 (1987); Darden , 477 U.S. at 182 (holding "the weight of evidence against the[defendant] was heavy; the overwhelming eyewitness and circumstantial evidence to support a finding of guilt on the char ges . . . reduced the likelihood that the jury's decision was influenced by the [prosecutor's] impr oper argument"). We must assess then the prosecutor's improper remarks, the curative instructions and the weight of the evidence.

D.

The prosecutor's challenged arguments at the very least were irrelevant, illogical and offensive. His "selection" argument appeared to be based on the per ception that rape is an expression of sexual desire rather than violence.14 In fact it is generally understood the opposite is true, Lieberman v. Washington, 128 F .3d 1085, 1098 (7th Cir. 1997) (citing authorities), and the trial court advised the jury of the invalidity of the prosecutor's theory in its curative instruction. To the extent the pr osecutor's theory implicitly represented that a black man's attraction to a white woman is an identifying characteristic, the trial court countered it was "unfair and unreasonable" to infer that the selection of a white victim would help identify Moor e. The trial court also invalidated the prosecutor's"sexual release" argument by instructing the jury that the inference was unreasonable and improper and ther e was no evidence of lack of sexual access.

The prosecutor's "selection" argument cited Moore's marriage to a white woman, arguably raising biases against miscegenation and ugly stereotypes. Racially or ethnically
_____

14. The State acknowledges, "The Appellate Division properly saw this remark as an ignorant and uninformed statement about the true nature of sexual assault." Br. for Appellees at 40.

29

based prosecutorial arguments have no place in our system
of justice. See McClesky v. Kemp, 481 U.S. 279, 309-10,
reh'g denied, 482 U.S. 920 (1987). In this regard, courts
applying Supreme Court precedent have found that
improper racial and ethnic references can be so prejudicial
as to result in a denial of due process. 15 But not all racial

_____

15. We recognize there ar e instances where trial courts immediately
grant a defendant's motion for mistrial because of a prosecutor's
prejudicial comments. Typically a trial judge's grant of a defendant's
motion for a mistrial is not reviewed on appeal, unless double jeopardy
concerns are present. See generally United States v. Dinitz, 424 U.S. 600
(1976). Therefore, the following sampling of appellate cases may not
accurately reflect the range of cases wher e a prosecutor's improper
racial
references constituted due process violations. We also note that some of
the following cases predate Donnelly. But to the extent these cases
examine the prejudicial effect of impr oper racial arguments we find them
helpful in illustrating the curability of impr oper racial arguments. See,
e.g., United States v. Cannon, 88 F .3d 1495, 1503 (8th Cir. 1996)
(prosecutor's reference to African-American defendants as "bad people"
in case where evidence was not overwhelming"gave [the] jury an
improper and convenient hook on which to hang their conduct,"
resulting in due process violation); United States v. Doe, 903 F.2d 16,
27-
28 (D.C. Cir. 1990) (prosecutor's statement that "Jamaican[s] [are] . . .
coming in and they're taking over" and r epeated references to "they" and
"them" in a drug case involving Jamaican defendants was improper
where evidence was not "overwhelming"); McFarland v. Smith, 611 F.2d
414, 416, 419 (2d Cir. 1979) (prosecutor's statement that African-
American officer's testimony about African-American defendant should
be believed because it is "someone she knows and that's a member of
her own race" was "constitutionally imper missible" because it invoked
race for an illogical purpose and created "a distinct risk of stirring
racially prejudiced attitudes"); Withers v. United States, 602 F.2d 124,
125, 127 (6th Cir. 1979) (prosecutor's statement that "not one white
witness has been produced" to support African-American defendant's
case was prejudicial and required new trial where evidence was not so
overwhelming as to create an "open and shut case" against defendant);
Miller v. North Carolina, 583 F.2d 701, 707 (4th Cir. 1978) (prosecutor's
statement that "I argue to you that the average white woman abhors
anything of this type . . . with a black man" in a rape case involving
African-American defendants was due process violation where no
curative instructions were given); Kelly v. Stone, 514 F.2d 18, 19 (9th
Cir. 1975) (prosecutor's asking jury to"[t]hink about the consequences
of a letting a guilty man . . . go free. Because maybe the next time it
won't be a little black girl from the other side of the tracks; maybe it
will
be somebody that you know," operated to deny African-American

30

and ethnic references are so pr ejudicial as to constitute due
process violations. Darden, 477 U.S. at 182; Donnelly, 416
U.S. at 644. In other instances, courts applying Supreme
Court precedent have held the prejudicial effect of a
prosecutor's improper references to race or ethnicity can be
cured with judicial instructions charging the jury to
disregard the improper statements. 16

_____

defendant accused of rape the right to fair trial when combined with two
other inappropriate comments); United States ex rel. Haynes v.
McKendrick, 481 F.2d 152, 155, 161 (2d Cir. 1973) (prosecutor's
statements about defense counsel's "experience with the people of the
colored race" and his knowledge of "their weaknesses and inability to do
certain things that maybe are commonplace for the ordinary person to
do," combined with his statement about "the custom and habit of many
colored people" to have "exotic hair dos" denied African-American
defendants fair trial where evidence in case was not "overwhelmingly
persuasive"); United States v. Grey, 422 F.2d 1043, 1045-46 (6th Cir.)
(prosecutor's statement about African-American defendant's African-
American character witness "running around with a white go-go dancer"
was sufficiently prejudicial to warrant new trial), cert. denied, 400 U.S.
967 (1970).

16. The following is a sampling of federal cases applying Supreme Court
precedent, see supra note 8, that have found improper prosecutorial
references to race were not so pr ejudicial as to result in the denial of
due
process. Again, some of these cases predate Donnelly. But to the extent
they illustrate the prejudicial effect of improper racial arguments, we
find
them helpful. See, e.g., Thomas v. Gilmore, 144 F.3d 513, 518 (7th Cir.
1998) (prosecutor's statement that African-American defendant had prior
arrests for sexual offenses with "young white women" was "too fleeting
and isolated" to have denied defendant fair trial), cert. denied, 525 U.S.
1123 (1999); Smith v. Farley, 59 F.3d 659, 663-64 (7th Cir. 1995)
(prosecutor's reference to African-American witness as "shucking and
jiving on the stand" and reference to African-American defendants as
"boys" did not interfere with the impartiality of the jurors because the
"evidence of guilt in the case was overwhelming"), cert. denied, 516 U.S.
1123 (1996); Russell v. Collins, 944 F .2d 202, 204 n.1 (5th Cir.)
(prosecutor's statement asking jury to imagine the fear of white murder
victim as "three black strangers" attacked her was an "isolated reference
to the race of the defendant" and did not deny defendant fair trial),
cert.
denied, 501 U.S. 1278 (1991); United States v. Chase, 838 F.2d 743, 750
(5th Cir. 1988) (prosecutor's statement about "Colombians [sic] with their
cautiousness" in a drug case involving Colombian defendant was not

31

In this case, the trial court commendably attempted to cure any possible harm and prejudice resulting from the prosecutor's improper arguments. After refuting the prosecutor's "selection" argument, the court specifically instructed the jury to disregard the pr osecutor's remarks, declaring that such racial references wer e invalid. As noted, the trial judge instructed the jury,

> I am ordering you to disregard what the prosecutor
> said in reference to the testimony, the appearance of
> Mrs. Moore, she being a white person, a Caucasian,
> and Mr. Moore being a black person, and that the

_____

"harmful error"); United Statesv. Cardenas, 778 F.2d 1127, 1131–32(5th Cir. 1985) (prosecutor's statement that defendant in a drug case was Colombian did not warrant a new trial); United States v. Harvey, 756 F.2d 636, 649 (8th Cir.) (prosecutor's statement that attributed the use of the term "honky" to African–American defendant accused of crimes involving white victims was prejudicial but was cured by cautionary instructions), cert. denied, 474 U.S. 831 (1985); Griffin v. Wainwright, 760 F.2d 1505, 1513, 1515 (11th Cir. 1985) (prosecutor's reference to victim of crime as "white" in case involving black defendant did not deny defendant fair trial), cert. denied, 476 U.S. 1123 (1986); United States v. Yonn, 702 F.2d 1341, 1349 (11th Cir.) (prosecutor's statement that defendant in drug case was Colombian did not warrant new trial), cert. denied, 464 U.S. 917 (1983); Thornton v. Beto, 470 F.2d 657, 659 (5th Cir.) (prosecutor's reference to African–American defendants as "niggers" during re-direct examination of victim did not deny defendants fair trial because defense counsel objected when remark was made and court instructed jury to disregard reference), cert. denied, 411 U.S. 920 (1973); United States v. Horne, 423 F.2d 630, 631–32 (9th Cir. 1970) (prosecutor's statement that "I am tir ed of [defense counsel] trying to let these people hide behind their race" and statement during closing that "[r]emember first, that he is a Negr o" was improper but did not affect African–American defendant's "substantial rights" when viewed in context of whole record); Brent v. White , 398 F.2d 503, 505 (5th Cir. 1968) (prosecutor's reference to rape victim as "white girl" in case where defendant was African–American was not due pr ocess violation because victim took the stand as a witness and it was appar ent to jury she was white), cert. denied, 393 U.S. 1123 (1969); United States v. Douglas, 862 F. Supp. 521, 530–31 (D.D.C. 1994) (pr osecutor's reference to Jamaican defendant's ethnicity in drug case did not r esult in due process violation), aff 'd, 70 F.3d638 (D.C. Cir. 1995), cert. denied, 516 U.S. 1098 (1996).

> reason, the selective process, was that he did this aggravated assault because he selected a white or Caucasian person. Disregard that. That's an unfair and unreasonable inference to be drawn from the testimony and I'm convinced that it's not proper argument to the jury.

The Appellate Division held that in the context of the entire trial, these curative instructions remedied the harms caused by the prosecutor's improper comments.[17] We are not convinced. The prosecutor's approach in advancing his "selection" argument was direct and deliberate. His own words demonstrate the purpose of his appeal was to bolster the State's identification evidence. Specifically he stated,

> Based on the testimony of Cheryl Moore, the case is stronger than ever, that the odds are that this defendant is the perpetrator [and] . . . you have more reason to convict Clarence McKinley Moore now that she has testified than ever.

The prosecutor noted there were "three important things" the jury should learn from Mrs. Moore's "appearance" as a defense witness. He stated:

> What did we learn when we found out that Cheryl Moore was the wife of the defendant? I suggest to you in a nonracist way that what we found out was that Clarence McKinley Moore made a choice to be with a Caucasian woman.

In other words, the prosecutor argued Moore's "preference" for white women was probative evidence of whether he raped M.A. His disclaimer, "It's not a statement of race; it's a question of choice," does not mitigate his injection of race into the jury's deliberations ("the case is stronger than ever"). The trial judge immediately understood the

_____

17. See, e.g., Greer, 483 U.S. at 767 n.8 ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an `overwhelming probability' that the jury will be unable to follow the court's instructions.") (quoting Richardson v. Marsh, 481 U.S. 200, 218 (1987)). Here, the prosecutor's improper arguments were not inadvertently presented.

33

implications of the prosecutor's argument. Calling the argument "unfair," the trial judge recognized the prosecutor's "selection" argument was prejudicial because it declared that Mrs. Moore's race was r elevant to the issue of Moore's guilt and could play to bias against interracial couples. The argument gave the jury an illegitimate "hook" on which to base their decision.18

The "selection" argument had no basis in the evidence. In a case involving a black defendant accused of raping a white woman we believe this argument, although presented with a disclaimer, was highly prejudicial and invited the jury to decide the case on bias. See Miller, 583 F.2d at 707 (prosecutor's statement that "I argue to you that the average white woman abhors anything of this type . .. with a black man" in a rape case involving African–American defendant was due process violation wher e no curative instructions were given). As noted, the trial judge had little doubt about the argument's impact when he admonished the prosecutor at sidebar to "stay away fr om the area of white/black because I don't think that's in the case."

The prosecutor's "sexual release" ar gument was also improper. The comment implied that Moor e was guilty of raping M.A. because he was unable to have sexual intercourse with his wife. While improper , we believe it is the kind of remark usually remedied by appropriate curative instructions. The trial judge immediately cautioned the jury that there was no evidentiary basis for this inference. We believe the trial judge ef fectively remedied any possible prejudice stemming from the r emark.

As noted, the prosecutor commented at the end of his summation that, "if you don't believe . . . [M.A.] and you think she's lying, then you've probably perpetrated a worse

_____

18. See, e.g., McCleskey, 481 U.S. at 309 n.30 ("If the circumstances of a particular case indicate a significant likelihood that racial bias may influence a jury, the Constitution requir es questioning as to such bias.")
(citing Ristaino v. Ross, 424 U.S. 589 (1976)); Cannon, 88 F.3d at 1503 (prosecutor's reference to African–American defendants as "bad people" in case where evidence against them was not overwhelming "gave [the] jury an improper and convenient hook on which to hang their conduct," resulting in due process violation).

assault on her." This was an improper appeal to the jurors' passions.[19] As the Supreme Court held in Berger v. United States, 295 U.S. 78, 85–88 (1935), overruled on other grounds, Stirone v. United States, 361 U.S. 212 (1960),

> The United States Attorney is the repr esentative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is . . . compelling . . . . He may prosecute with ear nestness and vigor – indeed he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.

M.A. suffered a brutal attack and rape. By asking the jury to factor their understandable sympathy for the victim of this horrible crime into deciding Moore's guilt or innocence, the prosecutor made an imper missible request to decide guilt on something other than the evidence. Courts applying Supreme Court precedent have found that similar appeals for jurors to decide cases based on passion and emotion were improper.[20] See supra note 8. But other

_____

19. See, e.g., Viereck v. United States, 318 U.S. 236, 247 (1943) (prosecutor's statement to jury during W orld War II that "the American people are relying upon you . . . for their protection against this sort of crime, just as much as they are relying upon the men who man the guns" was an improper appeal to passion); United States v. Cunningham, 54 F.3d 295, 300–01 (7th Cir.) (pr osecutor's statement to jury that "[c]ollectively you can go back there and stop [the defendants]. You can make sure that [the victim] isn't going to get beat up again. Heaven forbid, for the witnesses that came in this courtr oom the last couple of days if these guys are found not guilty. Heaven forbid. Don't let that happen," was improper appeal to jury's emotions), cert. denied, 516 U.S. 883 (1995); United States v. North, 910 F .2d 843, 895 (D.C. Cir. 1990) (prosecutor's statement comparing defendant to Adolf Hitler was improper appeal to passion), opinion withdrawn and superseded in part on reh'g, 920 F.2d 940 (D.C. Cir. 1900) (per curiam order), cert. denied, 500 U.S. 941 (1991).

20. See, e.g., United States v. Payne , 2 F.3d 706, 712 (6th Cir. 1993) (prosecutor's reference to defendant taking advantage of children at Christmas was improper appeal to emotion); United States v. Lee, 743 F.2d 1240, 1253 (8th Cir. 1984) (pr osecutor's statement that "[w]hat you do as jurors is going to be watched her e. You can better believe that each and every drug smuggler is watching what happens here today," was an improper appeal to emotion).

courts applying Supreme Court precedent have recognized
that improper appeals to passion can be cur ed.21 Id.

As noted, the trial court here instructed the jury,

> I want to tell you I'm going to order you-- I generally
> don't order people. I'm going to order you to disregard
> that last remark made by [the prosecutor] to the effect
> that the last thing I have to say to you is that if you
> don't believe her and you think she's lying, then you're
> probably perpetrating a worse assault on her .
> Disregard that remark. I have deter mined that's
> improper and you are not to consider that for any
> purpose in this case.

Given the graphic evidence of a brutal rape, we believe the
prosecutor's "perpetrating a worse assault" comment was
likely to improperly influence the jury's decision by
implying that a not-guilty verdict would compound M.A.'s
suffering.22

Furthermore, the prosecutor's ar gument
mischaracterized M.A.'s testimony. The principal issue at
trial was never M.A.'s credibility in ter ms of her
truthfulness or sincerity. In fact, there can be no doubt
about M.A.'s sincerity. The principal issue was the
reliability of M.A.'s identification, her opportunity to observe

_____

21. See, e.g., Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000)
(prosecutor's statement asking jurors to put themselves in shoes of
murder victim's family was not so prejudicial as to deny defendant right
to fair trial when curative instructions wer e given); Walker v. Gibson,
228
F.3d 1217, 1243 (10th Cir. 2000) (pr osecutor's reference to murder
victim as "cold in his grave" was impr oper appeal to emotion but not
sufficient to render trial unfair because it was "likely the crime itself
produced sympathy before [the] pr osecutor made [the] comments").

22. See, e.g., Kelly, 514 F.2d at 19 (prosecutor's asking jury to "[t]hink
about the consequences of a letting a guilty man . .. go free. Because
maybe the next time it won't be a little black girl from the other side of
the tracks; maybe it will be somebody that you know," operated to deny
African-American defendant accused of rape the right to fair trial when
combined with two other inappropriate comments); but see Walker, 228
F.3d at 1243 (prosecutor's refer ence to murder victim as "cold in his
grave" was improper appeal to emotion but not sufficient to render trial
unfair).

and remember her assailant. To the extent that implying a not-guilty verdict required finding M.A. lied, the prosecutor manipulated the identification testimony into a question of veracity when the real issue was reliability. To the extent it was intended to buttress M.A.'s credibility (in terms of her ability to observe or to refute the confabulation argument), the argument was improper because it played to the jurors' emotions and suggested a not-guilty verdict r equired finding M.A. lied.

Were this the only improper ar gument, we do not believe Supreme Court precedent would requir e finding a denial of due process. Taken in isolation, any pr ejudice stemming from the "perpetrating a worse assault" argument could be cured with strong instructions like those the trial judge issued here. But when viewed in light of the pr osecutor's "selection" argument, we believe due pr ocess concerns are implicated. Together, the prosecutor's "selection" argument and the "perpetrating a worse assault" ar gument were not only improper but prejudicial. Thr ough these arguments, the prosecutor asked the jury to decide the case on bias and emotion rather than on the evidence presented.

Specifically, his "selection" argument asked the jury to infer from Mrs. Moore's race, and not fr om the credibility or reliability of her alibi testimony, that her husband was guilty. As noted by the Supreme Court in Darden, when a prosecutor's argument manipulates or misstates the evidence, the argument can be so prejudicial as to result in the denial of due process. 477 U.S. at 182. Her e, the prosecutor manipulated testimony to bolster identification evidence.

We believe the trial court properly attempted to cure any resulting prejudice from the pr osecutor's arguments. As noted, its instructions directly charged the jury to disregard the prosecutor's improper refer ences to race and appeals to their emotions.23 Despite the trial court's strong instructions, the issue remains whether in the context of the entire trial and in view of all the evidence, the prosecutor's prejudicial remarks r esulted in a denial of due

_____

23. We do not believe the delay occasioned by the overnight adjournment is especially relevant here.

process. As recognized by the Supr eme Court in Darden, when looking at the entire trial, the r eviewing court should examine the strength of the evidence against the defendant. 477 U.S. at 182.

E.

Most of the evidence presented at trial focused on M.A.'s identification of Moore. The New Jersey courts found the identification evidence "more than sufficient" to support a finding of guilt beyond a reasonable doubt. Absent the prosecutorial misconduct here, we would agree. But whether the quantum of evidence against Moor e was sufficiently strong to support his conviction in light of the prosecutor's prejudicial arguments is a more difficult question.

M.A. acknowledged that her eyes were closed during most of the attack. She stated that she was only able to see her attacker's face at "one point when he was standing over the bed." During this "mere glimpse," she was not wearing her contact lenses and was understandably extremely frightened. The room in which the attack occurr ed was dark and was only illuminated by outside str eet lights. M.A. stated that although she saw her attacker's face, she could not see it "in detail" at the time of the rape. She was only able to give a rough physical description of her attacker including his race, and his approximate height and physical build. It was only after undergoing hypnosis that M.A. was able to give a more detailed description of her attacker including the clothing he was wearing and the color and texture of his hair. The only physical evidence presented at trial was the jacket found in Moore's home which M.A. identified as the one her attacker wore the night of the rape. But the laboratory tests on the fibers on the jacket were unhelpful in the identification.

As noted by the Supreme Court in Dar den, improper and prejudicial prosecutorial arguments generally are curable when the evidence is strong. 477 U.S. at 182. Where the evidence is not strong, however, the Court has found that highly prejudicial arguments may r esult in the denial of due process. See Greer, 483 U.S. at 765. As noted, there

was no physical evidence here, with the exception of the jacket, to connect Moore to the rape. M.A.'s pre-hypnotic identification of her attacker was vague. Her post-hypnotic identification was not strong because it was based on her recollection of her attacker resulting from a single brief view. While this evidence could properly support a finding of guilt, it is not as strong as those cases in which the Supreme Court has found highly prejudicial prosecutorial arguments curable. Greer, 483 U.S. at 765; Darden, 477 U.S. at 182.

In Darden, the Court found the prosecutor's improper arguments curable in part because "the weight of evidence against [the defendant] was heavy; the overwhelming eyewitness and circumstantial evidence to support a finding of guilt on the charges . . . reduced the likelihood that the jury's decision was influenced by [the prosecutor's improper] argument." 477 U.S. at 182 (internal quotes omitted). Similarly in Greer, the Supreme Court found the prosecutor's prejudicial comment about the defendant's post-arrest silence did not infect the trial with unfairness because the weight of the evidence against the defendant was strong. The Greer Court noted the evidence "primarily consisting of detailed testimony [of a co-conspirator who had confessed to the crime] which was corroborated by physical and other testimonial evidence" was important in finding no denial of due process. 483 U.S. at 767. In this case, there is no similarly strong physical, circumstantial, testimonial, or corroborating identification evidence linking Moore to the rape.

F.

Taking into account the prosecutor's highly prejudicial comments, the trial judge's curative instructions, and the strength of the evidence, we believe a reasonable application of Supreme Court precedent requires finding Moore's trial was so infected with unfairness that it was constitutionally infirm. See Greer, 483 U.S. at 765; Darden, 477 U.S. at 182. The Appellate Division improperly weighed the prejudicial effect of the prosecutor's references to race and his appeals to the jurors' sympathy for the victim in light of the strength of the evidence. Although the trial

39

judge issued strong curative instructions, the evidence against Moore was not sufficiently str ong to ensure that the jury disregarded the prosecutor's inflammatory and highly prejudicial arguments and decided the case solely on the evidence. A reasonable application of Supr eme Court precedent therefore requir es finding Moore's trial was so infected with unfairness that he was denied due process.

V.

For the foregoing reasons, we will r everse the District Court's judgment and remand this matter with directions to grant the writ of habeas corpus. The State of New Jersey may retry Moore. The writ will be issued conditioned upon a retrial within 180 days from the date on which the District Court enters its order.

40

RENDELL, Circuit Judge, concurring:

I join Judge Scirica's opinion, but I write separately to note my view that the prosecutor's remarks in his closing statement to the jury were not merely, as the Majority describes them, "irrelevant, illogical, and offensive." Maj. Op. at 29. They were, in fact, outrageous in their direct appeal to the jury to decide the case on impr oper grounds and abandon the standards that our system of justice requires.

The prosecutor's inflammatory remarks clearly were calculated to divert the jury from its swor n duty to focus on the evidence presented in the case. Indeed, her e the prosecutor not only manipulated and misstated the evidence, but actually attempted to fabricate evidence that did not exist. And in such circumstances, it goes without saying that it is the defendant who suf fers harm from the prosecutor's misconduct, not the state. Certainly, we cannot assume -- as the dissent does -- that given the egregious nature of the prosecutor's remarks, the jury would automatically recognize the misconduct and therefore be more likely to acquit the defendant. Under that curious theory, the worse the prosecutorial misconduct, the better off the defendant, and the less likely there is to be a due process violation. By that reasoning, one is left to wonder how prosecutorial misconduct could ever violate due process.

Furthermore, it bears emphasis that the curative instructions issued by the trial court were mediocre at best, and certainly did not cure the prejudicial effect of the prosecutor's outrageous remarks. Rather than, as in Donnelly, taking "special pains" to corr ect the prosecutor's improper remarks, Donnelly, 416 U.S. at 644, here the trial judge made no effort to remove the thin veil from the prosecutor's racist arguments by telling the jury that these arguments were, in fact, improper appeals to racial prejudice, and that such appeals should have no bearing on the case whatsoever. Moreover , the trial judge never, at any time during the trial, used the word "race" in his instructions to the jury, and the effect of the prosecutor's invidious appeals to racial prejudice, viewed in the context of the trial as a whole, could in no way be cur ed by

41

instructions that made no reference to race as a factor that the jury must exclude from its deliberations.

Finally, what makes the prejudicial impact of the prosecutor's misconduct in this case so clear is that the evidence of Clarence Moore's guilt was uniquely underwhelming. Judge Scirica's opinion sets forth in detail the problems inherent in M.A.'s identification of Moore -- which was the only relevant evidence of guilt in the entire trial -- and thus I see no need to repeat his excellent analysis here. However, I think it is worth noting that the use of hypnotically-induced identifications is controversial at best, and any concerns that we might have about the use of such identifications is heightened in a case such as this, where the identification is entir ely uncorroborated. E.g., Jackson v. Fogg, 589 F.2d 108, 112 (2d Cir. 1978) (noting that "[c]enturies of experience in the administration of justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness is highly suspect. Of all the various kinds of evidence it is the least reliable, especially where unsupported by corroborating evidence"); see also United States v. Wade, 388 U.S. 218, 228 (1967) (observing that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification").

In sum, viewed through the lens of the Supr eme Court's teachings on the implications of improper pr osecutorial remarks, there is no doubt that Clar ence Moore was denied due process. Indeed, when I consider the facts of this case -- the egregious prosecutorial misconduct, the lack of effective curative instructions, and the insubstantial evidence of guilt -- I can hardly imagine a more compelling case for reversal given the dictates of established Supreme Court precedent. As such, the trial process was infected with unfairness, and the New Jersey courts unr easonably applied this precedent by not granting Moor e a new trial.

42

GREENBERG, Circuit Judge, dissenting:

I respectfully dissent but do so reluctantly as I recognize that the court has made a careful study of this case and that it has reached its result only after thoughtful deliberation. Nevertheless, there can be no doubt that the Appellate Division of the Superior Court of New Jersey on two occasions went through a similar pr ocess with no less an awareness of its obligations and yet r eached a result opposite than that the court reaches her e. In the final analysis, then, this case involves a choice of two different views of the effect of the prosecutor's misconduct and the trial court's efforts to remedy the situation.

I do not reiterate the background of this case as the court fairly sets it forth. Nor do I discuss the controlling legal authorities at length as the court lays them out. Rather, I merely state the overar ching legal principles involved here. Under the AEDPA when a federal court considers a state prisoner's habeas corpus petition, the underlying decision of the state court with r espect to any claim that was adjudicated on the merits must contr ol unless, as germane here, it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. S 2254(d)(1). Inasmuch as this court acknowledges that this case does not implicate the "contrary to" prong of section 2254(d)(1), the court must determine whether the state decisions wer e an unreasonable application of Federal law as determined by the Supreme Court. I am satisfied that they were not and, in fact, were correct. Indeed, I believe that, if anything, the prosecutor's comments which resulted in the admonitions and directions of the trial court prejudiced the state at the trial. After all, the jury could not possibly have failed to recognize that the prosecutor was making an improper appeal to it. In this regard, I point out that this is not a situation in which the prosecutor suggested to the jury that he had important evidence pointing to the defendant's guilt which for some reason he had not presented to the jury. Thus, while the prosecutor made arguments not supported by the evidence they were merely impr oper on the basis of the evidence of which the jury was aware. Mor eover, I see

43

no reason to believe that the jury would have had any difficulty carrying out the judge's instructions to disregard the improper comments.

It is also important to remember that the Appellate Division reviewed this matter not once but twice and thus the court makes reference to both of its decisions. Actually, two separate panels of the Appellate Division consisting of five different judges considered this case, once on direct appeal and once in post-conviction relief pr oceedings and came to the unanimous conclusion that the pr osecutor's conduct did not require a reversal of the convictions.1 It also is important to recognize that these pr oceedings are remedial, not punitive, so that if, as I think is clearly the case, the verdict was not influenced by the prosecutor's improper remarks, we should deny Moor e relief.

Finally, I point out that under the AEDPA we are in the unfamiliar position of being obliged to make a highly deferential review of a state court's decisions of law for ordinarily our review of legal deter minations is plenary. Thus, we must guard against the possibility that our result is driven by our mere conclusion that the state court erred as the AEDPA requires more for the granting of habeas corpus relief.

For the foregoing reasons I respectfully dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

1. Moore contended that his right to a fair trial had been violated in the post-conviction relief proceedings as an aspect of an argument that he was entitled to a new trial because counsel had been ineffective.

44